Charles M. Carvell
Assistant Attorney General
N.D. State Bar ID No. 03560
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone (701) 328-3640
Facsimile (701) 328-4300

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE GOVERNMENT OF THE PROVINCE OF MANITOBA
Legislative Building
450 Broadway Avenue
Winnipeg, Manitoba R3C 0V8
Canada
(204) 945-3714,

Plaintiff,

v.

GALE A. NORTON
Secretary
United States Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240
(202) 208-7351,

JOHN W. KEYS, III
Commissioner
Bureau of Reclamation
United States Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240,

MARYANNE C. BACH
Great Plains Regional Director
Bureau of Reclamation
United States Department of the Interior
316 North 26th Street
Billings, MT 59101
(406) 247-7600,

DENNIS E. BREITZMAN
Dakota Area Manager
Bureau of Reclamation
United States Department of the Interior
Old Federal Building Avenue
304 East Broadway Avenue
Bismarck, ND 58501

**STATE OF NORTH DAKOTA'S UNOPPOSED MOTION TO TO INTERVENE AS DEFENDANT**

**Case No. 1:02-CV-02057- RMC**

(701) 250-4242, )
Defendants, )
and )
State of North Dakota, )
Defendant – Intervenor Applicant. )

---

The State of North Dakota asks the Court for permission to intervene as defendant in this case as a matter of right under Fed. R. Civ. P. 24(a). In the alternative, North Dakota moves for permissive intervention under Fed. R. Civ. P. 24(b). Along with this motion, North Dakota has filed a brief to support the motion. The motion is also accompanied by a suggested Order as well as a Proposed Answer to plaintiff's Complaint.

The North Dakota Attorney General's Office has contacted Mr. Eldon Greenberg, who represents plaintiff Manitoba, and Mr. Michael Johnson, who represents the federal defendants, to discuss this motion. Mr. Greenberg and Mr. Johnson stated that they do not oppose North Dakota's motion to intervene.

Dated this 5th day of February, 2003.

State of North Dakota
Wayne Stenehjem
Attorney General

By: [signature]

Charles M. Carvell
Assistant Attorney General
State Bar ID No. 03560
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone (701) 328-3640
Facsimile (701) 328-4300

Counsel for State of North Dakota,
Defendant Intervenor Applicants

Charles M. Carvell
Assistant Attorney General
N.D. State Bar ID No. 03560
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone (701) 328-3640
Facsimile (701) 328-4300

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE GOVERNMENT OF THE PROVINCE OF MANITOBA
Legislative Building
450 Broadway Avenue
Winnipeg, Manitoba R3C 0V8
Canada
(204) 945-3714,

Plaintiff,

v.

GALE A. NORTON
Secretary
United States Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240
(202) 208-7351,

JOHN W. KEYS, III
Commissioner
Bureau of Reclamation
United States Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240,

MARYANNE C. BACH
Great Plains Regional Director
Bureau of Reclamation
United States Department of the Interior
316 North 26th Street
Billings, MT 59101
(406) 247-7600,

DENNIS E. BREITZMAN
Dakota Area Manager
Bureau of Reclamation
United States Department of the Interior
Old Federal Building Avenue
304 East Broadway Avenue

**BRIEF IN SUPPORT OF STATE OF NORTH DAKOTA'S UNOPPOSED MOTION TO INTERVENE AS DEFENDANT**

**Case No. 1:02-CV-02057- RMC**

Bismarck, ND 58501                         )
(701) 250-4242,                            )
                                           )
       Defendants,                 )
                                           )
and                                        )
                                           )
State of North Dakota,                     )
                                           )
       Defendant – Intervenor Applicant.)

## TABLE OF CONTENTS

I. Introduction ..... 1

II. Argument ..... 1

A. Background ..... 1

1. The NAWS Project and North Dakota's Interests ..... 1

2. Federal Involvement ..... 3

3. Manitoba's Concern ..... 4

4. NEPA Compliance ..... 4

B. Rule 24 Intervention ..... 5

1. North Dakota is entitled to intervention as a matter of right ..... 5

a. North Dakota's motion is timely ..... 6

b. North Dakota has an interest relating to the subject matter of this action ..... 7

c. North Dakota is so situated that disposition of the action may, as a practical matter, impair or impede its ability to protect its interests ..... 8

d. North Dakota's interests are not adequately represented by existing parties ..... 8

e. North Dakota has standing ..... 10

2. North Dakota should be allowed permissive intervention ..... 11

a. North Dakota presents an "independent ground" for jurisdiction ..... 12

b. The motion is timely ..... 12

c. North Dakota raises a "common claim or defense" ..... 13

III. Conclusion ..... 13

APPENDIX

Declaration of James Lennington (February 4, 2003)

## I. Introduction

The Province of Manitoba challenges the adequacy of the Environmental Assessment for a water project under construction in the State of North Dakota. The Northwest Area Water Supply ("NAWS") Project is a joint project of North Dakota and the federal government. Despite the fact that NAWS is a project in which North Dakota has a significant role and the project's sole purpose is to improve the lives and health of North Dakota residents, Manitoba did not name North Dakota as a party. But the state has much more at stake in this suit than does the federal government and should be allowed to intervene.

The NAWS Project isn't "pork barrel." It will bring clean water from the Missouri River to the residents of north central and northwestern North Dakota. It will replace groundwater supplies that, in some instances, are inadequate and in most instances do not meet all federal drinking water standards. It will improve the health of North Dakotans. Nothing is more fundamental to life than water. No one has more to lose in this case than North Dakota.

## II.     Argument

### A.     Background

#### 1.     The NAWS Project and North Dakota's Interests

The residents of north central and northwestern North Dakota obtain most of their water from groundwater sources. NAWS Final Environmental Assessment 2 (Apr. 2001)("Final NAWS EA"); Lennington Declaration at ¶4. But most of this groundwater is "of poor quality and in some instances of limited quantity." Final EA at 102; Lennington Declaration at ¶4. See also Final EA at 6, 19, 47. Indeed, "[s]ome water consumed by people within the project area is negatively impacting their health." Id. at 102. See also Lennington Declaration at ¶5. Clean water is needed not only to improve human health, but will also have "positive economic and social impacts" on individuals and

communities. Final EA at 102; Lennington Declaration at ¶5. The "only" reliable, long-term source of water for north central and northwestern North Dakota is the Missouri River. Lennington Declaration at ¶6.

The concept of transporting water from the Missouri River to the towns, farms, and ranches in western North Dakota began in the late 1950s. Id. at ¶7. Interest in the idea grew in 1986 when Congress amended the 1974 Safe Drinking Water Act to impose stricter requirements on domestic water supplies. Id. As a response to these amendments, in 1987 North Dakota commissioned the Northwest Area Water Supply Study. Id. at ¶8. The study found that some of the water "consumed by people within the study area is poor for their health." Id. It also found that:

> 'The amount of available groundwater that meets the EPA Safe Drinking Water Standards is very limited, and in most cases requires costly treatment to meet those standards.'

Id. Therefore, the use of groundwater for regional water supply systems is, in the long-term, an impractical source. Id. Delivery of Missouri River water to north central and northwestern North Dakota was recognized as the solution. Id. at ¶9. It would provide residents with water "that meets both EPA's primary (health) and secondary (aesthetics) drinking water standards. Missouri River water will eliminate most if not all potential health problems involved with the consumption of poor quality water." Id.

Upon completion of the Northwest Area Water Supply Study, the North Dakota Legislative Assembly authorized the State Water Commission to develop and construct the NAWS Project. 1991 N.D. Leg. Ass. Ch. 704, Sec. 4 (codified at N.D.C.C. ch. 61-24.6-04). The law was enacted as an emergency measure. Id. at Sec. 6. The North Dakota Legislature found that northwestern North Dakota does "not enjoy safe drinking water," and that much of the area's water "contains iron, sulfates, alkali, salt, nitrates, fluoride, and other hazardous and discoloring substances." N.D.C.C. § 61-24.6-01. It found that some areas "do not have sufficient quantities of water to ensure a dependable, long-term supply." Id. It also found that a pipeline delivery system from

the Missouri River "may be the only alternative to provide northwestern North Dakota with a safe, good quality, dependable source, and adequate quantity of water." Id.

The state promptly began work designing the project. It completed the project's "pre-final" design in 1995. Lennington Declaration at ¶10. Work on the project's final design concept began in 1996. Id. The project provides for transporting Missouri River water by buried pipeline to north central and northwestern North Dakota and will serve 75,000 people in a number of communities and living on farms and ranches. Id. Construction on the project began in 2002 and by the end of the year 7.5 miles of pipeline had been laid at an approximate construction cost of $5.6 million. Id. at ¶13. Thus far, the amount of state money in the project is about $3.6 million, id., and the total amount of money is about $10 million. Id.

**2. Federal Involvement**

As stated, the NAWS Project isn't solely a state project. The United States, through its Bureau of Reclamation is also involved. The Bureau's role has its origins in 1986 legislation. That year Congress authorized a municipal, rural, and industrial water supply program for North Dakota, with "[a]ll planning, design, construction and operation" of the project to be undertaken pursuant to a "cooperative agreement" between the United States and North Dakota. Garrison Diversion Reformulation Act, 100 Stat. 418, Sec. 5 (1986). The 1986 authorization was amended in 2000 but again Congress required that the authorized water projects be constructed in close cooperation with North Dakota. Dakota Water Resources Act, Title VI, § 602, 114 Stat. 2763A-281-82 (2000). The Bureau and North Dakota have worked closely together on all aspects of the project for a number of years. Lennington Declaration at ¶¶3, 15. In 2002, two lengthy, formal agreements were entered to define the state/federal relationship for implementing the project. Id. at ¶15

**3. Manitoba's Concern**

Much of the area benefited by the NAWS Project drains into the Souris River. The Souris River rises in Saskatchewan and follows a southeasterly course across Saskatchewan and into North Dakota, where it veers back north and into Manitoba. Its waters ultimately empty into Hudson Bay. Manitoba is concerned about transboundary pollution. It is concerned that the project will bring biota from the Missouri River Basin into the Hudson Bay Basin and that this interbasin biota transfer will harm Manitoba's environment. Manitoba Complaint ¶¶ 23-34.

**4. NEPA Compliance**

Because of federal involvement, the National Environmental Policy Act applies. Studies of the project's environmental effects were conducted throughout much of the 1990s. These studies involved significant consultation and coordination with the governments of Canada and Manitoba. Lennington Declaration at ¶11. For example, joint Canadian/United States technical teams spent considerable time studying interbasin biota transfer and made recommendations to the state and Bureau of Reclamation. Final EA at 74-76; Lennington Declaration at ¶11. Many of these recommendations were incorporated into the project. E.g., Final EA at 77; Lennington Declaration at ¶11.

The draft Environmental Assessment report was presented in June of 1997. The proposed final Environmental Assessment as well as a draft Finding of No Significant Impact ("FONSI") were issued 1998. The Final Environmental Assessment was issued in April of 2001. A revised and final FONSI was issued in September of 2001. U.S. Bur. of Reclamation, NAWS Finding of No Significant Impact (Sept. 10, 2001).

In addition to satisfying NEPA requirements, federal agencies were also, in designing and evaluating the NAWS Project, subject to a special environmental mandate. Congress, respectful of Canadian interests, required that federal agencies

ensure that the project complies with United States commitments under the 1909 Boundary Waters Treaty. Congress imposed the duty in 2000, as well as in 1986.[1] In January of 2001, Sec. of Interior Babbitt concluded that the agencies had satisfied their duties and that the project complies with the treaty. Lennington Declaration at ¶12. In sum, North Dakota and the United States thoroughly studied interbasin biota transfer, consulted with Canada and Manitoba throughout the study, implemented recommendations of the Canada/United States technical team, and developed a project that will not harm Manitoba.

**B. Rule 24 Intervention**

**1. North Dakota is entitled to intervention as a matter of right.**

North Dakota seeks intervention under Rule 24. Rule 24(a) allows intervention as a matter of right when the motion is "timely" and when

> the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed. R. Civ. P. Rule 24(a).

The "central purpose" of the Rule is to allow intervention by those who might be "'practically disadvantaged'" by the case's disposition. Kleissler v. U.S. Forest Serv., 157 F.3d 964, 970 (3rd Cir. 1998) (quoting 7C Wright, Miller and Kane's Federal Practice

[1] Dakota Water Resources Act, Title VI, § 602, 114 Stat.2763A-282 (2000). "Prior to construction of any water systems authorized under this Act to deliver Missouri River water into the Hudson Bay basin, the Secretary, in consultation with the Secretary of State and the Administrator of the Environmental Protection Agency, must determine that adequate treatment can be provided to meet the requirements of the [Boundary Waters Treaty of 1909]." Garrison Diversion Reformulation Act, 100 Stat. 418, 422 Sec. 5 (1986). "Municipal, rural, and industrial water systems constructed with funds authorized under this Act may deliver Missouri River water into the Hudson Bay drainage only after the Secretary of the Interior, in consultation with the Secretary of State and the Administrator of the Environmental Protection Agency, has determined that adequate treatment has been provided to meet the requirements of the Boundary Waters Treaty of 1909."

& Procedure: Civ. 2nd § 1908, at 301(1986)). Given the broad purpose "to protect third parties affected by pending litigation," Id. at 971, it is unsurprising that intervention is usually allowed. Indeed, the D.C. Circuit has taken a "liberal approach to intervention." LaBouef, Lamb, Greene, & MacRae, LLP v. Abraham, 205 F.R.D. 13, 18 (D.D.C. 2001); The Wilderness Soc'y v. Babbitt, 104 F.Supp.2d 10, 18 (D.D.C. 2000). See also Stupak-Thrall v. Glickman, 226 F.3d 467, 472 (6th Cir. 2000) (Rule 24 is "'broadly construed in favor of potential intervenors'"); Turn Key Gaming, Inc. v. Oglala Sioux Tribe, 164 F.3d 1080, 1081 (8th Cir. 1999) the (Rule is "construed liberally, and doubts resolved in favor of the proposed intervenor"). Furthermore, the D.C. Circuit "has not adopted the Ninth Circuit rule that only the federal government can be a defendant in a NEPA case." The Wilderness Soc'y, 104 F.Supp.2d at 18. See also Kleissler, 157 F.3d at 971 (Third Circuit also rejects the Ninth Circuit's restrictive approach to intervention in NEPA cases).

Four elements must be satisfied for intervention by right. The applicant must show timeliness, an interest in the subject of the case, an impairment of the ability to protect that interest, and inadequate representation by existing parties. Fed. R. Civ. P. Rule 24(a). Some decisions impose a fifth element, standing, but it may not apply here and if it does North Dakota satisfies Article III standing. The elements required by Rule 24(a) are discussed below.

**a. North Dakota's motion is timely.**

The timeliness of a motion is determined from "all the circumstances." Smoke v. Norton, 252 F.3d 468, 471 (D.C. Cir. 2001). In particular, the Court must weigh four considerations. One, it must examine the amount of time that has elapsed since the suit began. Id. In this case, little time has elapsed. Manitoba's Complaint was filed on October 22, 2002. The federal defendants filed their Answer on January 23, 2003. In

Mille Lacs Band of Chippewa Indians v. Minnesota, 989 F.2d 994 (8th Cir. 1993), intervention was allowed 18 months after the suit started and nine months after the deadline for motions to add parties. The court noted that "litigation scarcely had progressed beyond the initial filing of pleadings." Id. at 999.

Two, the Court must consider the purpose for which intervention is sought. Smoke v. Norton, 252 F.3d at 471. The purpose of North Dakota's motion is to participate in a case concerning a project that will improve the health of North Dakota citizens. Without North Dakota's involvement, the project's fate will be decided without participation of the party the project is intended to benefit. Three, the Court must consider the need for intervention to preserve the applicant's rights. Id. Because of the state's significant interests, its presence in the case is the only way its interests can be protected.

Fourth, the Court must consider whether intervention will prejudice the existing parties. Id. Intervention will not prejudice either Manitoba or the federal defendants. Neither opposes intervention and, discovery has not begun, no motions have been filed, and a scheduling order has not yet been issued. North Dakota's intervention will not disrupt the case and none of the parties will be prejudiced.

**b. North Dakota has an interest relating to the subject matter of this action.**

North Dakota's interest in this litigation is clear. The lawsuit challenges NAWS and NAWS is a North Dakota project. The state, in cooperation with the Bureau of Reclamation, has spent a number of years designing and developing the project and last year began its construction. It has invested thousands of hours of time and nearly four million dollars. The project's sole purpose is to benefit North Dakota citizens.

The "'central purpose'" of the "interest test" is "'to allow intervention by those who might be practically disadvantaged by the disposition of the action.'" Kleissler, 157 F.3d at 970 (quoting 7C Wright, Miller & Kane Federal Practice and Procedure: Civil 2d § 1908, at 301 (1986)). North Dakota has such a profound interest in the project that there is no question that it might be disadvantaged by the Court's disposition of the case.

**c. North Dakota is so situated that disposition of the action may, as a practical matter, impair or impede its ability to protect its interests.**

If the Court grants the relief Manitoba requests, all construction work on the project will cease at least until an environmental impact statement is completed. The pipeline already installed will sit unused for an unknown period of time. The people of north central and northwestern North Dakota will be forced to continue their wait for clean water. If North Dakota is denied intervention, the state will not have a voice in the Court's evaluation of the NEPA challenge or in any settlement negotiations between Manitoba and the Federal Government. If intervention is denied, the fate of a project designed to improve the health of North Dakotans will be decided without North Dakota's presence at the table.

**d. North Dakota's interests are not adequately represented by existing parties.**

To satisfy this prong of Rule 24, an applicant's burden of demonstrating inadequacy is met by merely showing that representation "may" be inadequate. Trbovich v. United Mine Workers, 404 U.S. 528, 538 n.10 (1972). The burden of carrying this element is "minimal." Id. Typically, a government entity is presumed that it will provide adequate representation. Brody v. Spang, 957 F.2d 1108, 1123 (3d Cir. 1992). But "when an agency's views are necessarily colored by its view of the public

welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it, the burden is comparatively light." Kleissler, 157 F.3d at 972.

North Dakota's primary interest in this dispute is ensuring that clean water is brought to north central and northwestern North Dakota. The federal defendants don't necessarily have the same interest. Other interests may influence their litigation decisions.

For example, this case may implicate the relations of the United States with Canada. International politics may cause the federal defendants to handle the case differently than would North Dakota and without the sole goal of achieving the intended benefits of the NAWS Project for the state. Non-federal interests "may become lost in a thicket of sometimes inconsistent governmental policies." Kleissler, 157 F.3d at 974. Indeed, it is only realistic to assume that federal programs will be affected "by unanticipated policy shifts." Id.

In a case in which the timber industry sought to intervene on the federal government's side, the Court allowed intervention and commented that the "government must represent the broad public interest" and not just timber interests. Sierra Club v. Espy, 18 F.3d 1202, 1208-09 (5th Cir. 1994). See also Kansas Pub. Employees Retirement Sys. v. Reimer & Koger Asso., Inc., 60 F.3d 1304, 1308 (8th Cir. 1995) (a "'tactical similarity'" between a party and a proposed intervenor "'does not assure adequate representation'"). And in Sierra Club v. Glickman, 82 F.3d 106, 110 (5th Cir. 1996), the court stated that since the Department of Agriculture must "represent the interests of all U.S. citizens," it might not adequately represent the interests of Texas, which has "a narrower but independently vital interest in representing its residents . . . and allocating its natural resources." See also Tutein v. Daley, 43 F.Supp.2d 113, 129 (D. Mass. 1999) ("a prospective intervenor who emphasizes one interest is generally not adequately represented by a government agency which represents competing interests").

In Mille Lacs Band of Chippewa Indians v. Minnesota, 989 F.2d 994 (8th Cir. 1993), counties tried to intervene even though the State of Minnesota was already a party. The case is thus similar to the one here where North Dakota wants to intervene in a case in which the federal government is a party. The court stated:

> Because the counties . . . seek to protect local and individual interests not shared by the general citizenry of Minnesota, no presumption of adequate representation arises. . . . [T]here is no assurance that the state will continue to support all the positions taken in its initial pleading. Moreover, if the case is disposed of by settlement rather than by litigation, what the state perceives as being in its interest may diverge substantially from the counties'. . . . A potential conflict of this sort is sufficient to satisfy the proposed intervenors' minimal burden of showing that representation of their interests may be inadequate.

Id. at 1001.

North Dakota's interest in bringing high quality water to north central and Northwestern North Dakota will not change, but federal policies may change. Therefore, the federal defendants might not adequately represent North Dakota's interests, and the state must be allowed to intervene to protect its interests.

**e. North Dakota has standing**

Some Circuits require that a party seeking to intervene must prove standing. Other Circuits do not require standing, concluding that "[o]nce a valid Article III case-or-controversy is present, the court's jurisdiction vests. The presence of additional parties, although they alone could independently not satisfy Article III's requirements, does not of itself destroy jurisdiction already established." Ruiz v. Estelle, 161 F.3d 814, 832 (5th Cir. 1998). The disparity in the Circuits' view of the standing requirement is reviewed in Ruiz v. Estelle. Id. at 831-32.

The D.C. Circuit has sometimes stated that standing is an intervention requirement. E.g., In re Vitamins Antitrust Class Actions, 215 F.3d 26, 29 (D.C. Cir.

2000); Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1074 (D.C. Cir. 1998). But on other occasions it hasn't mentioned a standing requirement. E.g., Smoke v. Norton, 252 F.3d 468, 470 (D.C. Cir. 2001). Some courts rule that the standing requirement only applies to plaintiffs. Wynn v. Carey, 599 F.2d 193, 196 (7th Cir. 1979); Indian River Recovery Co. v. The China, 108 F.R.D. 383, 386 (D.C. Del. 1985); U.S. Postal Service v. Brennan, 579 F.2d 188, 190 (C.A.N.Y. 1978). Recently, this court declined to address whether the standing requirement applies to someone seeking to intervene as a defendant. City of Williams v. Dombeck, No. OOCV66, 2000 WL 33675559, at *2 n.1 (D.D.C. Aug. 17, 2000).

But it doesn't matter here whether or not there is a standing requirement, or whether or not it applies to just intervening plaintiffs and not to intervening defendants. North Dakota has standing. To satisfy standing a plaintiff must show (1) that it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992). In the first part of this brief the importance of the NAWS Project to North Dakota was explained. The harm that would be caused the state and its citizens is plain. The state's interests meet standing requirements.

**2. North Dakota should be allowed permissive intervention.**

If the court concludes that intervention of right is inappropriate, North Dakota should be given permissive intervention. Under Rule 24(b)(2), permissive intervention is proper when the intervenor presents (1) an independent ground for subject matter jurisdiction, (2) a timely motion, and (3) a claim or defense that has a question of law or fact in common with the main action. E.E.O.C. v. Nat'l Children's Ctr., Inc., 146 F.3d 1042, 1046 (D.C. Cir. 1998).

**a. North Dakota presents an "independent ground" for jurisdiction**

The first requirement of permissive intervention stems "from the basic principle that a court may not adjudicate claims over which it lacks subject matter jurisdiction." Id. at 1046. But it is doubtful that this requirement is even relevant here.

> Requiring an independent basis for jurisdiction makes sense . . . because the typical movant asks the district court to adjudicate an additional claim on the merits. No less than the original claimant, a third party who seeks to intervene . . . and litigate a claim on the merits must demonstrate that the claim falls within the court's limited jurisdiction.

Id. at 1046-47. But North Dakota isn't intervening to raise a substantive claim against either Manitoba or the federal government. It seeks to intervene solely to defend the NAWS Project from Manitoba's attack. North Dakota will assert neither a cross-claim nor a counterclaim. Its intervention will not affect whatever jurisdiction the Court may now possess.

In at least one kind of case an exception to the "independent jurisdiction" requirement is recognized, that is, in cases in which a party seeks to intervene to obtain documents protected by a confidentiality order. Id. at 1047. Since such intervenors do not ask the court to exercise jurisdiction over an additional claim on the merits, but rather to exercise a power that it already has, the "independent jurisdiction" requirement is irrelevant. Id. There is no substantive difference between this exception and North Dakota's intervention, an intervention that will not require or seek the Court to exercise authority it does or does not presently hold.

**b. The motion is timely**

As discussed above, the state's motion is timely.

c. **North Dakota raises a "common claim or defense"**

The third element of permissive intervention requires the intervenor to present a claim or a defense that has a question of fact or law common to the main action. North Dakota's intervention will assert defenses common to the federal defendants. The state, like the federal defendants, asserts that the NAWS Environmental Assessment was satisfactory, that an Environmental Impact Statement was unnecessary, that all requirements of NEPA and the Boundary Waters Treaty have been fulfilled, and that Manitoba lacks standing to pursue its claim in this Court. Having satisfied this third element, North Dakota is entitled to permissive intervention.

## III. Conclusion

North Dakota should be allowed to intervene. It has an intimate interest in the health of its citizens and in providing clean water to them, and, therefore, it has a deep interest in the NAWS Project and its uninterrupted completion. The state and the Bureau of Reclamation have closely cooperated in designing and building the project. The state has been closely involved in the NEPA process. North Dakota should be allowed to intervene as a matter of right. If the Court disagrees, it should exercise its discretion and allow North Dakota permissive intervention.

Dated this 5th day of February, 2003.

State of North Dakota
Wayne Stenehjem
Attorney General

By: [signature]
Charles M. Carvell
Assistant Attorney General
State Bar ID No. 03560
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone (701) 328-3640
Facsimile (701) 328-4300

Counsel for State of North Dakota,
Defendant Intervenor Applicants

e:\carvell\naws\intervene_brf-2.doc