# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| GOVERNMENT OF THE PROVINCE OF MANITOBA, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 02-2057 (RMC) |
| KEN SALAZAR, Secretary, United States Department of the Interior, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION

The source of this protracted dispute is the Northwest Area Water Supply Project (the "Project" or "NAWS"), a joint venture between the governments of the United States and the State of North Dakota, designed to withdraw water from Lake Sakakawea, a reservoir on the Missouri River, and transfer it across the continental divide in a 45-mile-long pipeline for use in Minot, North Dakota and its surrounding areas. The Province of Manitoba, Canada, sued the Secretary of the Department of the Interior and various officials of the Bureau of Reclamation (collectively, "Reclamation") in 2002, alleging that an April 30, 2001 Environmental Assessment ("EA") and a September 10, 2001 Finding of No Significant Impact ("FONSI") issued in connection with the Project violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* North Dakota intervened as a Defendant. Manitoba argued, *inter alia*, that Reclamation was arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A),[1] because it failed

---

[1] Courts "apply the APA's arbitrary and capricious standard to a NEPA challenge." *Nevada v. Dep't of Energy*, 457 F.3d 78, 87 (D.C. Cir. 2006).

to take a "hard look" at the risks and consequences of transferring foreign biota from the Missouri River Basin to the Hudson Bay Basin.  The Court ordered Reclamation to complete an EA "that considers an integrated analysis of the possibility of leakage and the potential consequences of the failure to fully treat the Missouri River water at its source" and further ordered Reclamation to "revisit its finding of no significant impact."  February 3, 2005 Order [Dkt. # 88] at 1.  The Court "permitt[ed] work to proceed [on the pipeline] to the extent it [did] not affect the environment or the NEPA process" but enjoined Reclamation from proceeding with construction that would "influence or alter the agency's ability to choose between water treatment options . . . ."  April 15, 2005 Order [Dkt. # 95] at 5 & 6.

On December 5, 2008, Reclamation issued an Environmental Impact Statement ("EIS") addressing water treatment options in the Missouri River Basin.  It also reissued the EA and FONSI, which Reclamation incorporated into the EIS.  Manitoba, joined by the State of Missouri, who sued Reclamation separately,[2] allege that the EIS and incorporated documents violate NEPA. Pending before the Court are all parties' cross motions for summary judgment.  Further, Reclamation and North Dakota move to lift the stay; Missouri moves for a permanent injunction.  For the reasons explained herein, the Court will deny the motions for summary judgment and the motions to lift the stay filed by Reclamation and North Dakota, grant in part and deny in part the cross motions for summary judgment filed by Manitoba and Missouri, and deny Missouri's motion for a permanent injunction.  The Court will order Reclamation to take a "hard look" at (1) the cumulative impacts of water withdrawal on the water levels of Lake Sakakawea and the Missouri River, and (2) the

_____

[2] *State of Missouri v. Dep't of Interior*, Civ. No. 09-373 (D.D.C., filed February 24, 2009), has been consolidated with this case.

consequences of biota transfer into the Hudson Bay Basin, including Canada.

# I.  FACTS[3]

## A.  Background

### 1.  The Project

The Continental Divide separates water flows in the Unites States so that streams flow to opposite parts of the continent.  Where it goes through North Dakota, the Divide separates two river basins, the Missouri River Basin and the Hudson Bay Basin.  On the southwestern side of the Divide in North Dakota, the Missouri River flows into the Missouri River Basin and eventually drains south to the Gulf of Mexico.  On the northeastern side of the Divide, the waters flow north and east into the Hudson Bay Basin.

These Basins have distinct ecological characteristics and contain different species of fish and other aquatic organisms, as well as pathogenic species such as bacteria, viruses, protozoa, fungi, and other microscopic organisms.  The co-mingling of untreated water from one Basin into another can result in the introduction of biota — the various life forms of a particular region or habitat — that may be invasive and dangerous to indigenous fish, plants and/or animals.  The effect upon fish of "interbasin biota transfer," for example, can be devastating.  The introduction of foreign biota can eliminate indigenous species, cause reduced growth and survival rates in indigenous species, and change the trophic structure of fish communities.  In documented cases, non-native species have displaced native species through direct competition, predation, inhibition of reproduction, environmental modification, transfer of new parasites and diseases, and destruction

---

[3] For a more complete recitation of the facts, *see Government of Province of Manitoba v. Norton*, 398 F. Supp. 2d 41 (D.D.C. 2005).

of the gene pool through hybridization.  *See Manitoba*, 398 F. Supp. 2d at 45.

   For many years, northwestern North Dakota has experienced water supply problems. Many municipalities and small communities in the region, as well as farms and ranches, rely upon groundwater sources that are finite or of poor quality.  The largest city in the region, Minot, currently obtains most of its water from the Minot and Sundre aquifers.  In the past, these aquifers were recharged by water from the Souris River, which flows south from Canada into North Dakota, takes a wide swing through the northwest part of the state, and flows north back into Canada.  However, increased water usage and the construction of two water storage reservoirs in Canada — which reduced flows on the Souris River in the United States — have limited the amount of available water in these aquifers.

   The Northwest Area Water Supply Project is a joint federal-state project that "involves the construction of a municipal, rural, and industrial [] bulk water distribution system in North Dakota."  Compl. ¶ 2.  The Bureau of Reclamation, a constituent agency under the Secretary of the Interior, is charged with planning and construction and is accomplishing this in partnership with the State of North Dakota.  The primary purpose of the Project is to provide drinking water that meets the "secondary" standards of the Safe Water Drinking Act, 42 U.S.C. § 300f, to local communities and rural water systems in eight to ten counties in North Dakota.

   The cornerstone of the Project is the source of the water for NAWS.  As presently configured, NAWS would withdraw over three and one-half *billion* gallons of Missouri River water from Lake Sakakawea every year.  The water, which would be partially disinfected and pre-treated south of the Basin Divide, would flow through buried pipelines across the Divide into the Hudson Bay Basin where it would receive final treatment in Minot prior to distribution.  The finished water

would be delivered by pipeline to communities and rural water systems north of the Basin Divide.

Water from the project would drain into the Souris River, which flows into Manitoba.

2.       *The EA and FONSI*

Reclamation issued a final EA on April 30, 2001, concluding that "[t]he risk of interbasin transfer of non-native biota as a result of the NAWS project is considered low." Compl. ¶ 46.  The EA analyzed three alternatives and a no action alternative.

Alternative A included an intake of Missouri River water at either Lake Audubon or Lake Sakakawea, a pre-treatment facility at the intake or at a booster pump station, and upgrade of the water treatment plant ("WTP") in Minot.  The pipeline between intake at the lakes and the Minot WTP would be about forty-five miles long and include pumping stations and storage reservoirs.  The Missouri River water would be disinfected with ozone or chlorine/chloramine — with a chloramine residual maintained in the pipeline for biofilm control — at a pre-treatment facility on the Missouri River Basin side of the Divide to provide biota transfer control and inactivation of protozoan pathogens and viruses.  After reaching the Minot WTP, the pre-treated water would be disinfected further with ultraviolet radiation before being delivered to communities and the rural water systems.

Unlike Alternative A, Alternative B would not have used Missouri River water at all, relying upon the existing water sources in the Hudson Bay Basin. This alternative would have required the drilling of additional wells, some additional pipelines, and other upgrades, but would have eliminated the need for miles of pipeline compared to Alternative A and the Preferred Alternative.  It would not have involved the interbasin transfer of Missouri River water.

The Preferred Alternative combined Alternatives A and B and was developed based on the capital costs for both an integrated system and individual treatment systems.  Under the

Preferred Alternative the Missouri River water would first be partially pre-treated at or near the intake and later treated to "drinking water" standards at the Minot WTP.

Based on the findings in the EA, Reclamation issued a FONSI on September 10, 2001, which stated that a full EIS was not necessary because "[r]easonably foreseeable activities, as described in the EA, will not have adverse effects on the human or natural environment."  Compl. ¶ 47.

3.      <em>The Challenge to the EA and FONSI</em>

On October 22, 2002, Manitoba filed a complaint challenging the adequacy of the EA and seeking injunctive relief.  Manitoba filed its Motion for Summary Judgment and Permanent Injunction in March 2004.  *See* Dkt. # 26.  That motion focused on the risk of interbasin transfer of non-indigenous species through the pipeline.  *See id.* at 7-13.  Rather than move to intervene, Missouri filed a brief *amicus curiae* on March 8, 2004.  *See* Dkt. # 49.  Missouri noted that its primary concern was "the out-of-basin transfer of Missouri River Basin water to the Hudson Bay Basin generally because water that leaves the basin before it flows through Missouri cannot be used by Missourians."  *Id.* at 2.

On February 3, 2005, the Court issued an order granting in part and denying in part Manitoba's motion for summary judgment.  *See* Dkt. # 88.  The Court remanded the case to Reclamation "for completion of an Environmental Assessment that considers an integrated analysis of the possibility of leakage and the potential consequences of the failure to fully treat the Missouri River water at its source given the agency's awareness of treatment-resistant biota."  *Id.* at 1.  The Court further ordered Reclamation to "revisit its finding of no significant impact."  *Id.*  The Court invited further briefing on the scope of any injunction.

On April 15, 2005, the Court granted in part and denied in part Manitoba's request for a permanent injunction. *See* Dkt. # 95. The Court found that "certain parts of the distribution system can proceed irrespective of a subsequent decision regarding the most appropriate method for treating transferred water." *Id.* at 3. Wishing to avoid "unnecessary delay in the delivery of a reliable source of high quality water to approximately 81,000 people," *id.* at 5, the Court issued a more narrow injunction designed to ensure that the agency did not pre-judge the decision on the open issues. Specifically, the Court allowed work to continue on the construction of the pipeline to Minot and indicated that it would approve any additional construction that "would not influence or alter the agency's ability to choose between water treatment options." *Id.* at 6.[4]

### B.    Post Remand Developments

#### 1.    *The Notice of Intent to Prepare an EIS*

A year after the case was remanded, Reclamation published its Notice of Intent to prepare an EIS for the Project. 2009 AR 2006_12 at 2-5. The "Proposed Action" was identified as "complete construction of the remaining NAWS Project features and facilities to deliver water to municipal, rural and industrial water users in the service area while minimizing the risk of transfer of non-native biota." *Id.* at 5. According to the Notice:

> The geographic scope of the EIS includes areas and resources within the United States affected by water diversion and delivery for NAWS Project purposes. This includes, but is not necessarily limited to: (1) the sites of all NAWS Project features and facilities; (2) lands that receive NAWS Project [Municipal, Rural & Industrial] water

---

[4] On December 3, 2009, the Court ordered Reclamation to explain statements in the EIS "which indicate prior construction limited water treatment options in contravention of this Court's injunction . . . ." Dkt. # 168 at 1. Reclamation timely filed its explanation and Manitoba filed a response. Reclamation's motion for leave to file a reply to Manitoba's response [Dkt. # 173] will be granted.

supplies; and (3) the potential depletion affects on the Missouri River
affected by water diversion for the NAWS Project.

*Id.* Further, Reclamation advised that it was "seeking input from the public on the development of

reasonable alternatives to the proposed action and analysis of their environmental effects that will

be described in the EIS." *Id.* at 6. The Notice was signed on February 7, 2006, and published in the

Federal Register on March 6, 2006.

### 2.      The EIS and Reissued EA and FONSI

On December 5, 2008, Reclamation issued a final EIS incorporating by reference its

"[f]indings and environmental commitments in the Final EA and FONSI[,]" except "the potential

impacts and environmental commitments associated with the treatment of Missouri River (Lake

Sakakawea) water and operation and maintenance of a biota WTP and related features." 2009 AR

2008_172 at 19. The EIS itself was limited to water treatment issues in the Missouri River Basin.

Reclamation examined three action alternatives plus a no action alternative.

The "No Action Alternative" is "[t]he preferred treatment alternative identified in the

Final EA . . . and selected in the FONSI . . . ." *Id.* at 23. It "would include chemical disinfection of

raw Missouri water prior to being delivered into the Hudson Bay basin." *Id.* "Additional safeguards,

including isolation valves and corrosion control measures, were included in the construction of the

buried pipeline to ensure a reduced risk of a biological invasion due to  pipe breach." *Id.*

"Ultraviolet (UV) disinfection along with softening and filtration would be provided at the existing

Minot WTP." *Id.*

The "Basic Treatment Alternative" "would include a pre-treatment (coagulation,

flocculation, sedimentation) process followed by chemical and UV disinfection prior to the water

crossing the drainage divide[,]" on the Missouri River side of the Divide.  *Id.*  "The purpose of the pre-treatment process is to reduce raw water turbidity which can influence the effectiveness of the disinfection process."  *Id.*   "Softening and filtration would be provided at the existing Minot WTP." *Id.*

The "Conventional Treatment Alternative" "would include a pre-treatment process of dissolved air flotation (DAF) followed by media filtration and disinfection using UV and chemicals (chlorine and chloramines) within the Missouri River basin."  *Id.* at 24.  "Softening and filtration would be provided at the existing Minot WTP."  *Id.*

Finally, the "Microfiltration Treatment Alternative" "would include pre-treatment (coagulation, pin floc) followed by membrane filtration and chemical and UV disinfection processes prior to the water crossing the drainage divide."  *Id.*  "Softening and filtration would be provided at the existing Minot WTP."  *Id.*

Reclamation's Preferred Alternative is the No Action Alternative plus UV disinfection at the Missouri River Basin side of the Divide.[5]  *See id.* at 40.

## II.  LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Anderson v. Liberty*

---

[5]  Reclamation added UV disinfection at the Missouri River Basin side of the Divide only after the Environmental Protection Agency suggested that it do so.  *See* 2009 AR 2008_172 at 43 ("The application of ultraviolet treatment (UV) technology at Max, instead of Minot, would provide additional safeguards at minimal additional cost and would result in a further reduction of biota prior to transfer over the basin divide.").

*Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  In addition, the nonmoving party may not rely solely on allegations or conclusory statements.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor.  *Id.* at 675.  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III.  ANALYSIS

"NEPA has twin aims."  *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).  "First, 'it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.'"  *Id.* (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)).  "Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process."  *Id.*  These goals are "realized through a set of 'action-forcing' procedures that require that agencies 'take a 'hard look' at environmental consequences,' and that provide for broad dissemination of relevant environmental information.'"  *Robertson v. Methow Valley Citizens*

*Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

"Other statutes may impose substantive environmental obligations on federal agencies, but NEPA

merely prohibits uninformed — rather than unwise — agency action." *Id.* at 351.  Insofar as "the

statute requires that agencies assess the environmental consequences of federal projects by following

certain procedures during the decision-making process[,]" NEPA's "mandate 'is essentially

procedural[.]'" *City of Alexandria v. Slater*, 198 F.3d 862, 866 (D.C. Cir. 1999) (quoting *Vt. Yankee*,

435 U.S. at 558).

"An agency's primary duty under the NEPA is to 'take a 'hard look' at environmental

consequences.'" *Pub. Utils. Comm'n v. FERC*, 900 F.2d 269, 282 (D.C. Cir. 1990) (quoting *Kleppe*,

427 U.S. at 410 n.21).  "Since NEPA requires the agency to 'take a 'hard look' at environmental

consequences before taking a major action,' the judiciary must see that this legal duty is fulfilled."[6]

*Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 151 (D.C. Cir. 1985) (quoting *Balt. Gas & Elec.*,

462 U.S. at 97-98); *see also Sierra Club v. Peterson*, 717 F.2d 1409, 1413 (D.C. Cir. 1983) ("the

court must insure that the agency took a 'hard look' at the environmental consequences of its

decision").  "Although the contours of the 'hard look' doctrine may be imprecise," a court must at

a minimum "'ensure that the agency has adequately considered and disclosed the environmental

impact of its actions and that its decision is not arbitrary and capricious.'" *Nevada v. Dep't of*

*Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006) (quoting *Balt. Gas & Elec.*, 462 U.S. at 97-98).

While Manitoba and Missouri advance numerous arguments why the EIS assertedly

--------

[6]  "Major Federal action includes actions with effects that may be major and which are
potentially subject to Federal control and responsibility."  40 C.F.R. § 1508.18.  As this Court
already has found, that the Project is a "major Federal action" within the meaning of NEPA "cannot
be seriously disputed."  *Manitoba*, 398 F. Supp. 2d at 54.

is deficient under NEPA, they really boil down to three:  Reclamation failed to take a "hard look" at reasonable alternatives to the Project, particularly the "in-Basin alternative," *i.e.*, to obtain water from wells dug in the Hudson Bay Basin; Reclamation failed to take a "hard look" at the cumulative impacts of the Project on Missouri River water levels; and Reclamation failed to take a "hard look" at the consequences of biota transfer into the Hudson Bay Basin, including Canada.  The Court will address each in turn.

### A.      Reasonable Alternatives

NEPA provides that "all agencies of the Federal Government shall study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."   42 U.S.C. § 4332(2)(E).[7] An EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  40 C.F.R. § 1508.9(b).  In reviewing an EA, "[t]he Court must assess whether the agency took 'a hard look at the alternatives and explain[ed] its reasons for rejecting them.'"  *Sierra Club v. Watkins*, 808 F. Supp. 852, 871 (D.D.C. 1991) (quoting *Coal. on Sensible Transp., Inc. v. Dole*, 642 F. Supp. 573, 593 (D.D.C. 1986), *aff'd*, 826 F.2d 60 (D.C. Cir. 1987)).

Manitoba and Missouri argue that Reclamation failed to take a "hard look" at in-Basin alternatives, but that is not the case.  There is extensive discussion of an in-Basin alternative

---

[7] Manitoba and Missouri's citation to Section 102(2)(C)(iii), which requires federal agencies to include a "detailed statement" on "alternatives to the proposed action" for "major Federal actions significantly affecting the quality of the human environment," is misplaced because Reclamation reissued its FONSI.  Therefore, the applicable NEPA provision is § 102(2)(E), not § 102(2)(C)(iii).

in the EA.  Reclamation explained in the EA that "groundwater for these communities and rural water systems is characterized as being hard, high in total dissolved solids (TDS), and in most instances, high in either sodium, sulfate or both." 2002 AR Vol. 1 at 485.  Reclamation rejected this alternative in large measure because "[t]o have water of similar quality to the Integrated System and meet the secondary safe drinking water standards of the Environmental Protection Agency, each community and rural water association, with the exception of Parshall, would need a reverse osmosis treatment plant to provide high quality, treated water which would be low in TDS, sulfates, sodium, and total hardness." *Id.* at 486.  "Each community's reverse osmosis plant would require a building large enough to house the required number of reverse osmosis treatment units." *Id.*  In addition, "[w]hile the quality of the finished water from a reverse osmosis system would be very good, the reverse osmosis process requires high energy use and includes the generation of a brine which requires disposal." *Id.*  "Disposal of the brine could be done either through deep injection wells or in an evaporation pond." *Id.*  Reclamation determined that the capital costs for the in-Basin alternative were more expensive than the capital costs for the preferred alternative. *See id.* at 495.

Manitoba and Missouri fault Reclamation for relying on the analysis in the EA and not conducting another analysis in the EIS.  However, Reclamation reissued the EA and expressly incorporated it into the EIS.  While it is true that the Court found the EA to have been inadequate, that finding was not based on Reclamation's failure to consider alternatives.  The Court found the EA to have been inadequate because Reclamation failed to take a "hard look" at interbasin biota transfer.  That finding does not undermine the "hard look" Reclamation did take in the EA at the in-Basin alternative, as well as other alternatives.  Nothing in NEPA requires an agency to re-analyze, in an EIS, alternatives that it previously rejected in an EA, provided the agency took the requisite

-13-

"hard look" at the alternatives in the EA. *See Lee v. U.S. Air Force*, 354 F.3d 1229, 1238-40 (10th Cir. 2004) (NEPA not violated where EIS omitted alternatives eliminated from consideration in earlier EA after "hard look").   Neither Manitoba nor Missouri points to any significant new information or changes that warrant supplementation of the EA.   Accordingly, the Court finds that Reclamation's exploration of alternatives in the EA is sufficient under NEPA.

### B.   Environmental Impacts

#### 1.   *Cumulative Impacts on Lake Sakakawea and the Missouri River*

Reclamation acknowledged in the EIS that "[a] concern was raised about cumulative impacts that could occur as a result of constructing multiple water projects that withdraw water from the Missouri River system, as well as expected increases in other diversions from the Missouri River." 2009 AR 2008_172 at 20.   However, Reclamation deemed the issue to be "outside the scope of analysis for the EIS" because "[t]he effects of Project withdrawals from the Missouri River were evaluated in the Final EA" and were determined to "'not be measurable at or below Lake Sakakawea.'"   *Id.* at 19-20 (quoting EA, 2002 AR Vol. 1 at 588).   The entirety of the EA's discussion of the issue provides:

> Flows down the Missouri River through Lake Sakakawea average[d] 16,527,000 acre-feet per year for the period of record of 1967-1999. The NAWS project will withdraw approximately 10,500 acre-feet per year from the Missouri River system via Lake Sakakawea or Lake Audobon; this constitutes approximately 0.00058 per cent of the current average annual flow.   Cumulative impacts could accrue in conjunction with other future withdrawals along the system. However, the incremental effect of the NAWS withdrawal, when added to other past, present, and reasonably foreseeable future withdrawals from the Missouri River system, will not be measurable below Lake Sakakawea.

2002 AR Vol. 1 at 588.   From this rudimentary calculation Reclamation concluded in the EIS that

"further evaluation of this issue is not warranted." 2009 AR 2008_172 at 20.

        The Court does not agree. In drawing this conclusion in the EA, Reclamation provided no data regarding other existing Missouri River water withdrawal projects and conducted no analysis of other reasonably foreseeable projects expected to withdraw Missouri River water. For example, Reclamation failed even to consider the cumulative impacts of the Project in conjunction with other planned Missouri River water withdrawal projects, such as the Red River Valley Water Supply Project. Nor did it consult with the Corps of Engineers, the entity that controls the amount of water released from Lake Sakakawea. All it did was look at the Project in isolation and conclude that the amount of water the Project alone is expected to withdraw is too small to impact the water level of Lake Sakakawea and the Missouri River. That is a glance at the issue, not a "hard look."

        "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* Indeed, Reclamation acknowledged in the EA that "[c]umulative impacts could accrue in conjunction with other future withdrawals along the system," 2002 AR Vol. 1 at 588, and the Environmental Protection Agency recommended "that cumulative impacts be examined in the environmental impacts chapter within the context of the Corps of Engineer's (COE) Management Plan for the Missouri River." 2009 AR 2007_120 at 3; *see also id.* at 2 ("EPA continues to be concerned, as in the Red River Project, that the proposed project could further lower the lake levels (cumulative impacts), exacerbating conditions within Lake Sakakawea and resulting in transfers of degraded water."). Rather than examine the cumulative

impacts on Lake Sakakawea and the Missouri River, Reclamation concluded without any analysis that "the incremental effect of the NAWS withdrawal, when added to other past, present, and reasonably foreseeable future withdrawals from the Missouri River system, will not be measurable below Lake Sakakawea." *Id.* Such "conclusory remarks" are insufficient to discharge the agency's NEPA obligations,[8] as they "do not equip a decisionmaker to make an informed decision about alternative courses of action or a court to review the Secretary's reasoning." *Natural Res. Def. Council v. Hodel*, 865 F.2d 288, 298 (D.C. Cir. 1988). "Even under the applicable deferential standard of review," the Court finds that "allowing the Secretary's 'analysis' to pass muster here would eviscerate NEPA." *Id.* at 299.

Reclamation protests that the cumulative impacts on Lake Sakakawea and the Missouri River are not properly at issue because "Reclamation, as informed by the EA and the Court's orders, and the scoping process it undertook with respect to the EIS, correctly identified the necessary scope to address the 'possible environmental impacts of NAWS;' *i.e.*, the potential transfer of invasive species." Fed. Defs.' Reply at 7. Reclamation overlooks that the Court found its EA to have been inadequate and ordered it to "revisit its finding of no significant impact." February 3, 2005 Order. While the basis for the Court's remand was Reclamation's failure to take a "hard look"

---

[8] Reclamation asserts that it "considered, and attached to the . . . EIS as a supporting document, a study entitled a Supplemental Analysis of Missouri River Effects . . . conducted by the Corps in support of the [Red River Valley Water Supply Project] EIS" and that that report "determined that 'very little impact is anticipated' for the [Red River Valley Water Supply Project] — a project that would involve depletions that were more than three times larger than those from NAWS." Fed. Defs.' Reply [Dkt. # 149] at 31-32. Reclamation's reliance on a report prepared by the Corps of Engineers with respect to a different Missouri River water withdrawal project is no substitute for an independent examination of the cumulative impacts of this Project. "One agency cannot rely on another's examination of environmental effects under NEPA." *Or. Envtl. Council Kunzman*, 714 F.2d 901, 905 (9th Cir. 1983). "The agency must independently assess the consequences of a project." *Steamboaters v. FERC*, 759 F.2d 1382, 1394 (9th Cir. 1985).

at interbasin biota transfer, the Court expressed no opinion about whether the agency had taken a "hard look" at other environmental issues.   In other words, contrary to Reclamation's characterization, the Court did not hold that interbasin biota transfer was the *only* environmental impact of the Project requiring further analysis.   Reclamation reads too much into the fact that the Court did not previously find the EA to be deficient in this respect.   Because Missouri was not a party to that proceeding, and Manitoba did not raise the environmental impacts on the water level of Lake Sakakawea and the Missouri River, the Court did not reach the issue.   Under these circumstances, where the Court made no finding that Reclamation had taken a "hard look" at the cumulative impacts on Lake Sakakawea and the Missouri River, the Court rejects Reclamation's argument that "the scope of the FEIS was properly limited to analyzing the issues remanded by the Court, which did not include impacts on the Missouri River system." Fed. Defs.' Reply at 31. *See Or. Natural Res. Council v. Marsh*, 52 F.3d 1485, 1490 (9th Cir. 1995) ("Because of the Corps' refusal even to *consider* environmental factors not specifically identified by this court in *Marsh II* or raised during the scoping process, EISS-2's cumulative impacts analysis omits issues of critical importance.") (emphasis in original).

Nor does the Court agree that it is too late for Missouri to object to Reclamation's cumulative impacts analysis (or, more accurately, the lack thereof).   Even assuming that the FONSI was a final agency action that commenced the running of the six-year statute of limitations period,[9] the FONSI ceased to be the agency's final action on February 3, 2005, when the Court remanded the

---

[9]   28 U.S.C. § 2401(a) provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." The D.C. Circuit has interpreted § 2401 to apply to claims brought under the APA. *See Impro Prods., Inc. v. Block*, 722 F.2d 845, 850 & n.8 (D.C. Cir. 1983).

EA to Reclamation and ordered the agency to revisit its finding of no significant impact. When Reclamation reissued the EA and FONSI by incorporation into the EIS three years later, it renewed the six-year statute of limitations period to challenge its findings in the EA and FONSI.[10] *See Pub. Citizen v. NRC*, 901 F.2d 147, 151-52 (D.C. Cir. 1990) ("to the extent that an agency's action 'necessarily raises' the question of whether an earlier action was lawful, review of the earlier action for lawfulness is not time-barred") (quoting *Envtl. Def. Fund v. EPA*, 852 F.2d 1316, 1325 (D.C. Cir. 1988)); *see also id.* at 152 ("court may examine 'prior agency action on which the validity of the later agency action under review depends'") (quoting *Nat'l Ass'n of Greeting Card Publishers v. USPS*, 607 F.2d 392, 425 n.59 (D.C. Cir. 1979)). "In this case," Reclamation has "reconsidered and reinstated its original policy[,]" which "necessarily raises the lawfulness of the original policy, for agencies have an everpresent duty to insure that their actions are lawful." *Id.*

### 2.    Consequences of Biota Transfer into the Hudson Bay Basin

In its haste, Reclamation also failed to do what the Court had specifically ordered it to do: analyze "the possibility of leakage and the potential *consequences* of the failure to fully treat the Missouri River water at its source . . . ." February 3, 2005 Order at 1 (emphasis added). Reclamation brushed that concern aside, reasoning that because "[p]otential breaches in the water transmission pipeline are the same for all alternatives . . . water transmission risks are *not* incorporated into this analysis." 2009 AR 2008_172 at 90 (emphasis added). Reclamation apparently was under the mistaken impression that it could forego such an analysis because "[g]iven the pipe materials and countermeasures such as cathodic protection incorporated into the pipeline's

---

[10] Reclamation's laches argument fails because it has not shown inexcusable delay and undue prejudice. *See Daingerfield Island Protective Soc. v. Lujan*, 920 F.2d 32, 37 (D.C. Cir. 1990).

construction, conveyance risks across for each alternative would be considered low." *Id.*

The agency cannot avoid taking a "hard look" at water transmission risks from a pipeline breach simply because the potential for a breach does not vary under the agency's proposed alternatives, particularly when the EIS was so severely limited in scope to areas outside the Hudson Bay Basin. The *consequences* of the release of foreign biota should a breach occur — or even from the normal 5% leakage to be expected from any pipeline[11] — might be catastrophic and should inform Reclamation's course of action. It may be that the risk of a breach is low given the pipeline's construction, but that is not an excuse for Reclamation to refuse entirely to analyze the *consequences*. When the *degree* of potential harm could be great, *i.e.*, catastrophic, the *degree* of analysis and mitigation should also be great.

Reclamation recognized that Manitoba had fairly challenged the failure of the EA to grapple with the consequences of a biota transfer; it decided to complete an EIS. It then lost its way and overread this Court's opinion to "bless" the EA, including, incredibly, Reclamation's conclusion that its original preferred alternative was sufficient and its addition of UV treatment was merely generous. *See* 2009 AR 2008_172 at 41 ("The No Action Alternative was determined to provide adequate treatment for this Project; however, Reclamation recognizes that the chemical disinfection included in [the] No Action Alternative does not provide protection against disinfection resistant organisms such as *Cryptosporidium* before the water crosses the drainage divide. . . . Therefore, Reclamation is proposing to add UV disinfection to the chemical disinfection included in the No

---

[11]   According to the U.S. Geological Survey, "[i]n most water distribution systems, some percentage of the water is lost in transit from treatment plants to consumers; water loss typically ranges between 5% and 20% of production. . . . [L]eakage is usually present in any water transmission system." 2009 AR 2007_141 at 85.

Action Alternative to target a wider range of organisms."); *see also id.* at 44 ("The Preferred

Alternative includes treatment processes which are capable of reducing the Project-related risks of

a biological invasion even further than what can be achieved by the No Action Alternative, which

has already been determined as an adequate level of treatment."). This conclusion so misreads the

Court's opinion that it is rather breathtaking. The Environmental Protection Agency recommended

the same course of action as this Court ordered: it suggested that Reclamation "provide more

specific information on the potential ecological *consequences* of a successful invasion of the Hudson

Bay basin, *e.g.*, how a decrease in native species populations due to transmission of diseases or

parasites could affect the ecological structure and functioning of the affected aquatic habitats." 2009

AR 2007_144 at 5 (emphasis added). Reclamation did nothing in response to the Court's Order or

its sister agency's recommendation. Because Reclamation has not studied the potential

consequences from pipeline leakage or breach — which are to be anticipated[12] — it cannot evaluate

whether its water treatment proposals sufficiently address and mitigate for such potential

consequences as NEPA demands. *See Robertson*, 490 U.S. at 351 (NEPA "prohibits uninformed

. . . agency action").

　　　　　　　　One final point must be addressed. Reclamation asserts that it has no duty to take a

"hard look" at the consequences of biota transfer in Canada because NEPA does "not require

---

[12] In addition to normal leakage, the U.S. Geological Survey noted that "[b]uried pipelines are subject to significant degradation from various internal and external corrosion mechanisms leading to maintenance and repair issues, especially as the transmission system ages." 2009 AR 2007_141 at 109. "Within the context of uncertainty and system performance, risk management practices must be in place, because all systems fail. A system's fault tolerance may lead to a false sense of system security, since chances of system failure may be very small at any particular moment, and perceptions of risks will be influenced by differences in an individual's or group's interpretation of categorical or numerical estimates." *Id.* at 130.

assessment of environmental impacts within the territory of a foreign country" and "therefore this type of evaluation is considered outside the scope of the EIS." 2009 AR 2008_172 at 20. However, the Council on Environmental Quality "has determined that agencies must include analysis of reasonably foreseeable transboundary effects of proposed actions in their analysis of proposed actions in the United States."[13] Council on Environmental Quality Guidance on NEPA Analyses for Transboundary Impacts (July 1, 1997), available at http://ceq.hss.doe.gov/nepa/regs/transguide.html (last visited March 5, 2010 at 11:00 a.m.); *see also Swinomish Tribal Cmty. v. FERC*, 627 F.2d 499, 510-12 (D.C. Cir. 1980) (concluding that the agency took a "hard look" at the Canadian impacts of dam construction in Washington State); *Wilderness Soc'y v. Morton*, 463 F.2d 1261, 1261-63 (D.C. Cir. 1972) (granting intervenor status to Canadian environmental groups seeking to challenge the trans-Alaska pipeline under NEPA). NEPA requires agencies to consider reasonably foreseeable transboundary effects resulting from a major federal action taken within the United States.[14] Accordingly, when analyzing the consequences of biota transfer in the Hudson Bay Basin, Reclamation must include in its analysis the impact in Canada.

---

[13] Reclamation argues that this informal guidance is not binding on it or owed substantial deference by the Court. That the guidance is not binding on agencies or entitled to substantial deference by courts does not sap it of all persuasive authority.

[14] This Court's decision in *Basel Action Network v. Maritime Administration*, 370 F. Supp. 2d 57 (D.D.C. 2005), is not to the contrary. In that case, this Court held that NEPA did not require the agency to consider the extraterritorial environmental effects of towing ships across the high seas because, *inter alia*, NEPA has no application to major federal actions taken "outside of U.S. territorial waters . . . ." 370 F. Supp. 2d at 71. Unlike towing ships across the high seas, this Project is a major federal action occurring entirely within the territorial borders of the United States.

## IV.  CONCLUSION

The Court is acutely aware that Reclamation and North Dakota have built miles of pipeline and that the citizens of the area want the Project completed.  These facts do not excuse Reclamation's failure to follow the law.  This case demonstrates the adage that it is better to do something right the first time.  Reclamation has wasted years by cutting corners and looking for short cuts.  It has yet to do what NEPA demands:  take a "hard look" at the environmental consequences of the Project.

For the foregoing reasons, the Court will order Reclamation to take a "hard look" at (1) the cumulative impacts of water withdrawal on the water levels of Lake Sakakawea and the Missouri River, and (2) the consequences of biota transfer into the Hudson Bay Basin, including Canada.  Defendants' motions for summary judgment and to lift the injunction [Dkt. ## 130 & 131] will be denied.  Plaintiffs' cross motions for summary judgment [Dkt. ## 138 & 140] will be granted in part and denied in part.  Missouri's motion for a permanent injunction [Dkt. # 143] will be denied. The Government of Canada's and the environmental advocacy groups' motions for leave to participate as *amicus curiae* [Dkt. ## 132 & 133] will be granted.  A memorializing Order accompanies this Memorandum Opinion.


Date: March 5, 2010                          _____/s/_____
                                             ROSEMARY M. COLLYER
                                             United States District Judge