# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

GOVERNMENT OF THE PROVINCE
OF MANITOBA, *et al*.,

      Plaintiffs,

      v.

RYAN ZINKE, Secretary, United States
Department of the Interior, *et al*.,

      Defendants,

and

STATE OF NORTH DAKOTA

      Defendant-Intervenor.

---

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 02-2057 (RMC)
(consolidated with 09-373)

## OPINION

The National Environmental Protection Act (NEPA), 42 U.S.C. §§ 4321, *et seq*.

(2012), is designed to ensure that federal officials seriously study the environmental effects and

implications of any major federal action before proceeding. As this aged litigation makes clear,

NEPA's requirements cannot be sidestepped. In the end, however, NEPA does not dictate the

outcome of an agency decision. As long as the federal agency has adequately identified its

options, seriously studied and evaluated the consequences of each, identified and adopted

reasonable measures to mitigate adverse consequences, and selected its action after balancing all

of the above, NEPA will not prevent the agency from going ahead. Much less, after a thorough

environmental impact statement, is the Judiciary assigned the duty of balancing and choosing

between serious but opposing policy choices. This Court's work is done because the Bureau of

Reclamation has finally done its work. The policy debate is legitimate and has strong advocates

on each side but it cannot be decided by a court.  The government's motion for summary

judgment will be granted.

## I.  BACKGROUND

The Court presumes familiarity with its prior opinions and will not belabor the

facts.  *See Gov't of the Province of Manitoba v. Norton*, 398 F. Supp. 2d 41, 65 (D.D.C. 2005)

*(Manitoba I)* (remanding for a "more searching" environmental assessment); *Gov't of the*

*Province of Manitoba v. Salazar*, 691 F. Supp. 2d 37, 51 (D.D.C. 2010) *(Manitoba II)*

(remanding for a "hard look" at the impact of withdrawals from Lake Sakakawea and the

Missouri River and consequences of foreign biota transfer into Hudson Bay Basin); *see also*

*Gov't of the Province of Manitoba v. Zinke*, 849 F.3d 1111, 1122 (D.C. Cir. 2017) (concluding

that significant change in circumstances warranted modification of injunction).

In response to longstanding water shortages and poor water quality in

northwestern and northcentral North Dakota, in 1987 the Bureau of Reclamation (Reclamation)

developed the Northwest Area Water Supply Project (NAWS or the Project).  The goal of

NAWS is to provide water from Lake Sakakawea, a reservoir in the Missouri River Basin, to

communities in North Dakota in need of water.  In the process, water will be transferred through

pipes across the Basin Divide,[1] which separates two large water Basins:  to the south is the

Missouri River Basin and to the north is the Hudson Bay Basin.  These Basins have distinct

---

[1] The parties have at various points in the course of this litigation referred to "the continental divide" which is not to be confused with the Great Continental Divide dividing water systems that drain into the Atlantic Ocean from those that drain into the Pacific Ocean.  The divide relevant to this case runs through North Dakota from the northwest corner diagonally across the state.  It is most likely part of the Laurentian Divide, which divides water flowing northwards to the Arctic Ocean to that running southwards to the Atlantic Ocean, Caribbean Sea, and Gulf of Mexico.  Since the parties do not specify the continental divide relevant here, it will be referred to as the "Basin Divide" or "Divide."

ecological characteristics and contain different species of fish and other aquatic organisms, as well as pathogenic species such as bacteria, viruses, protozoa, fungi, and other microscopic organisms. The co-mingling of water from these two Basins could result in the introduction of foreign biota—the various life forms of a particular region or habitat—that may be invasive and dangerous to indigenous biota. Foreign biota "whose introduction does or is likely to cause economic or environmental harm or harm to human health" are also referred to as alien invasive species (AIS). Executive Order 13112, 64 Fed. Reg. 6183 (February 3, 1999). The federal government and the State of North Dakota have labored for years to bring water from Lake Sakakawea across the Divide to the parched communities in the northwestern area of North Dakota. Water in North Dakota drains north into the Hudson Bay Basin. Manitoba therefore has a strong interest in avoiding the introduction of AIS from the Missouri River Basin draining into the Province.

In 2002, the Province of Manitoba sued under NEPA to prevent Reclamation from proceeding with NAWS, arguing that an April 2001 Environmental Assessment (EA) and a Finding of No Significant Impact[2] (FONSI) violated NEPA. *See Manitoba I*, 398 F. Supp. 2d at 44. As designed originally, NAWS would have transferred billions of gallons of water each year from the Missouri River Basin, on the southern side of the Basin Divide, into the Hudson Bay Basin, on the northern side of the Divide, without any treatment to avoid an inevitable transfer of AIS. Years later, Reclamation has finally produced a thorough and studious environmental impact statement (EIS). The policy choice between (i) the risk of AIS entering Manitoba as water drains north from North Dakota into the Hudson Bay Basin and (ii) providing adequate

---

[2] "Finding of no significant impact means a document by a Federal agency briefly presenting the reasons why an action . . . will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." 40 C.F.R. § 1508.13.

water to the communities in northwest North Dakota has been made, with significant mitigation efforts to reduce the risks to Manitoba.

The pending cross-motions for summary judgment address the sufficiency of the Final 2015 Supplemental Environmental Impact Statement (2015 SEIS), for which notice of availability was published in the Federal Register by Reclamation on April 10, 2015, 80 Fed. Reg. 19347-01 (Apr. 10, 2015); *see also* 2015 SEIS [Dkt. 260-8] 2015 AR 2015_107; and the Record of Decision (2015 ROD) identifying the selected action for implementation. *See* 2015 ROD [Dkt. 260-2] 2015 AR 2015_100. Reclamation continues to propose, with North Dakota's support, the annual conveyance of billions of gallons of water across the Basin Divide to ten counties in northwestern North Dakota. *See* Recl. Mot. Sum. J. [Dkt. 243]; North Dakota Mot. Sum. J. [Dkt. 242]. Reclamation and North Dakota ask the Court to dissolve its injunction, as amended, which has prevented most construction work on NAWS since 2005. Manitoba and the State of Missouri, which fears the consequences of the loss of so much water from the Missouri River on its downstream citizens, oppose lifting the injunction and file cross-motions for summary judgment.[3] *See* Manitoba Mot. Sum. J. [Dkt. 249-1]; Missouri Mot. Sum. J. [Dkt. 246].

**A. The 2015 SEIS**

The 2015 SEIS analyzes the same five alternatives that had been previously described in the Draft SEIS, issued in June 2014, and on which Reclamation received copious public comments. *See* Draft SEIS [Dkt. 258-14] 2015 AR 2014_165 at 35-36; 2015 SEIS, 2015 AR 2015_107 at 46. The alternatives include a "no action" alternative, as required by NEPA,

---

[3] Manitoba submitted two memoranda in support of its Cross-Motion for Summary Judgment. For clarity, when the Court refers to Manitoba's Motion for Summary Judgment it will be referencing the Corrected Brief found at Dkt. 249-1.

which would mean an end to the Project.  *See* 2015 SEIS, 2015 AR 2015_107 at 50; *see also* 40

C.F.R. § 1502.14(d) (requiring agencies to "[i]nclude the alternative of no action" in an EIS).  Of

the other four alternatives, two are "inbasin alternatives," drawing water from the Hudson Bay

Basin, and two are "Missouri River alternatives," drawing water from the Missouri River Basin.

2015 SEIS, 2015 AR 2015_107 at 46.  The first inbasin alternative, "Groundwater with

Recharge," would use existing groundwater from the Minot and Sundre aquifer wellfields (both

within the Hudson Bay Basin) as the primary source of water and use the Souris River (also

within the Hudson Bay Basin) to provide artificial recharge to the aquifers.  *Id*. at 51.  The

second inbasin alternative, "Groundwater with Recharge and the Souris River," includes the

same water sources as the first and would also use the Souris River as a direct source of water to

supplement the groundwater.  *Id*. at 60.  The inbasin alternatives would draw from water

exclusively on the northern side of the Basin Divide, avoiding the need to transfer water between

Basins and thus any need to construct a Biota Water Treatment Plant (WTP) in Max, North

Dakota on the southern side of the Basin Divide.  *See* 2015 SEIS Executive Summary [Dkt. 260-

10] 2015 AR 2015_109 at 14-15.

   The Missouri River alternatives both involve piping water from Lake Sakakawea

in the Missouri River Basin across the Divide and blending it with water north of the Basin

Divide.  As now envisioned, both would require the construction of a Biota WTP in order to treat

the water prior to transfer across the Divide.  *See* 2015 SEIS, 2015 AR 2015_107 at 66, 73.  The

water would then be treated again north of the divide at a second water treatment plant in Minot,

North Dakota.  The first of these alternatives, "Missouri River and Conjunctive Use," would

blend Lake Sakakawea water with groundwater from the Minot and Sundre aquifers as well as

water from the Souris River.  *Id*. at 66.  Reclamation identifies the second Missouri River

alternative, "Missouri River and Groundwater," as its preferred alternative. *Id*. at 99. This alternative would blend Lake Sakakawea water with groundwater only, with no additional water from the Souris River. *Id*. at 73.

The 2015 SEIS identifies five methods for treating water at a Biota WTP in Max, N.D., south of the Basin Divide, for the Missouri River alternatives. The Draft SEIS planned to use Chlorination/Ultraviolet (UV) Inactivation at the Biota WTP to treat the water in part before piping it northward to the Minot WTP, on the northern side of the Basin Divide, to complete treatment. *Id*. at 99. The Environmental Protection Agency (EPA) submitted comments to the Draft SEIS advising that the use of Chlorination/UV Inactivation could result in the formation of disinfection byproducts which "pose a risk to human health when present in drinking water" at high concentrations. Comments to Draft SEIS [Dkt. 260-4] AR 2015 AR 2015_104 at 289. EPA recommended that Reclamation consider Conventional Treatment, which avoids the formation of disinfection byproducts by removing solids and other particles before applying Chlorination/UV Inactivation treatment. *Id*. Manitoba has been urging the use of Conventional Treatment for years to mitigate the risk of AIS transfer between Basins. *See* Manitoba Mot. Sum. J. at 7 (noting "the ROD selected a biota treatment technology—conventional treatment— that Manitoba (any many other commenters) recommended"). Reclamation, however, insists that such treatment is *not* necessary to avoid AIS but was only adopted to comply with regulations issued under the Safe Water Drinking Act, 42 U.S.C. §§ 300f *et seq*., by reducing the risk of the formation of disinfection byproducts. *See* 2015 SEIS, 2015 AR 2015_107 at 99 (stating that the choice of Conventional Treatment "does not reflect the level of treatment necessary to address the concerns relative to the Project-related risk of AIS transfer"). Reclamation maintains that "[o]ther options proposed for the Biota WTP would be sufficient to

reduce the . . . risk for AIS transfer" but acknowledges that Conventional Treatment reduces the risk of AIS transfer by providing "protection against the organisms of concern and includ[ing] a physical barrier for removal." *Id.* at 99-100.

Despite Reclamation's final acquiescence to the use of Conventional Treatment, Manitoba is not appeased, arguing that Reclamation's assessment of the risk of AIS transfer continues to fall short of NEPA obligations. It emphasizes a 2016 report issued by the Department of the Interior after completion of the 2015 SEIS, which emphasized the concerns with AIS transfer generally:

> Invasive species pose one of the greatest ecological threats to America's lands and waters. Their control can be complex and expensive and is often conducted in perpetuity; their harm can be irreversible. . . . Preventing the introduction of invasive species is the first line of defense against biological invasion.

Manitoba Mot. Sum. J. at 8 (citing Dep't of the Interior, *Safeguarding America's Lands and Waters from Invasive Species: A national framework for early detection and rapid response* (2016) at v, 1) (*Safeguarding Report*). An invasion occurs when alien species "breach biogeographic barriers and extend their range. . . . [E]arly detection is the process of surveying for, reporting, and verifying the presence of a non-native species, before the founding population becomes established or spreads so widely that eradication is no longer feasible." *Safeguarding Report* at 4. Manitoba cites the *Safeguarding Report* to emphasize the seriousness of the consequences of the transfer of AIS into the Province. Notably, Reclamation was one of the agencies involved in the study and policy decisions that led to the *Safeguarding Report*, so it had full awareness of that analysis as it completed the 2015 SEIS and ROD.

Nevertheless, Reclamation has produced a 2015 SEIS and ROD that collectively demonstrate appropriate and reasonable efforts to avoid and mitigate the risks of transfer of AIS

from the Missouri River Basin as a result of the Project and the Court will not interfere with what is now a policy choice made by the Executive Branch.

## II. LEGAL STANDARDS

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.

When evaluating cross-motions for summary judgment, each motion is reviewed "separately on its own merits to determine whether [any] of the parties deserves judgment as a matter of law." *Family Trust of Mass., Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (internal quotation marks omitted). Neither party is deemed to "concede the factual assertions of the opposing motion." *Competitive Enter. Inst. Wash. Bureau, Inc. v. Dep't of Justice*, 469 F.3d 126, 129 (D.C. Cir. 2006). "[T]he court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." *Select Specialty Hosp.-Bloomington, Inc. v. Sebelius*, 774 F. Supp. 2d 332, 338 (D.D.C. 2011) (internal quotation marks omitted). A genuine issue exists only where

"the evidence is such that a reasonable jury could return a verdict for the nonmoving party."
*Anderson*, 477 U.S. at 248.

## B. NEPA

NEPA requires government agencies to take a "hard look" at the environmental impact of proposed actions before deciding whether to proceed. 42 U.S.C. § 4332(C); *Stand Up for California! v. Dep't of the Interior*, 204 F. Supp. 3d 212, 303 (D.D.C. 2016). If an agency determines that a proposed federal action will "significantly affect[] the quality of the human environment," it must prepare a detailed environmental impact statement assessing "the environmental impact of the proposed action," 42 U.S.C. § 4332(C)(i), "any adverse environmental effects which cannot be avoided should the proposal be implemented," § 4332(C)(ii), and any "alternatives to the proposed action," § 4332(C)(iii). This procedural requirement is "[a]t the heart of NEPA." *Sierra Club v. U.S Army Corps of Engineers*, 803 F.3d 31, 37 (D.C. Cir. 2015). The statute does not require a particular outcome but rather imposes "'procedural requirements . . . with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions.'" *Delaware Riverkeeper Network v. Fed. Energy Regulatory Comm'n*, 753 F.3d 1304, 1310 (D.C. Cir. 2014) (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004)); *see also Delaware Riverkeeper Network v. Fed. Energy Regulatory Comm'n*, 857 F.3d 388, 394 (D.C. Cir. 2017) ("So long as the agency takes a hard look at the environmental consequences, NEPA does not mandate particular results.") (internal quotation marks omitted)). NEPA does not "'require agencies to elevate environmental concerns over other appropriate considerations.'" *WildEarth Guardians v. Jewell*, 738 F.3d 298, 303 (D.C. Cir. 2013) (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)). It requires informed and well-considered decision-making "but

not necessarily the best decision." *New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 476 (D.C. Cir. 2012).

The Court reviews an EIS to ensure the agency took a "hard look" at the environmental consequences of its proposed project. The Court's role is not to "'flyspeck' an agency's environmental analysis, looking for any deficiency no matter how minor." *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006). Rather, the Court's role is to "'ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious,'" *Id.* (quoting *Balt. Gas & Elec. Co.*, 462 U.S. at 97-98), and that it has "[r]igorously explore[d] and objectively evaluate[d] all reasonable alternatives." 40 C.F.R. § 1502.14(a). The "arbitrary and capricious" standard applies to both the agency's compliance with NEPA's procedures and the adequacy of the agency's EIS. *See Nevada*, 457 F.3d at 87-88.

### III. ANALYSIS

Manitoba complains that Reclamation's work is not done: it asserts that Reclamation failed to consider adequately the possibility of increased turbidity in the waters of Lake Sakakawea due to the effects of climate change; it assails as insufficient Reclamation's plans for mitigation through an Adaptive Management Plan; it discredits Reclamation's analysis of the availability of sufficient in-Basin water without the need for water from Lake Sakakawea; and it complains that Reclamation pre-selected its preferred option.

#### A.  Turbidity and Climate Change

NAWS is constructed for a lifetime of 40 years or more. *See* 2015 SEIS, 2015 AR 2015_107 at 23 (explaining NAWS "is intended to address long-standing water supply and water quality problems experienced by residents of northwestern North Dakota . . . through

2060"). Over those decades, Manitoba complains that climate change can be expected to increase the turbidity of the water in the Missouri River and Lake Sakakawea, thereby decreasing the ability of the Biota WTP to treat it. *See* Manitoba Mot. Sum. J. at 23. Turbidity "is a surrogate for a broad array of constituents—soil particles, dissolved minerals, microbes, bacteria, and viruses," which, in high quantities, can reduce the efficacy of water treatment systems. *Id*.

In its comments to the Draft SEIS, Manitoba expressed concern with Reclamation's choice of Chlorination/UV Inactivation because "the effectiveness of UV irradiation is widely acknowledged to be adversely impacted by elevated levels of turbidity and organics." Comments to Draft SEIS, 2015 AR 2015_104 at 227. Manitoba insisted that best practices required a filtration system to deal with turbidity and recommended conventional treatment:

> The only secure means of ensuring the effectiveness of both UV and chlorination [as proposed in the Draft SEIS] is to first pre-treat the water using conventional treatment. This will reduce turbidity and dissolved organic levels in the feed water to the UV and $C1_2$ systems and also maximize the UV transmittance of the raw water thus ensuring far greater reliability and effectiveness of the UV and $C1_2$ systems.

*Id*. at 231. Reclamation has now done exactly that. Nevertheless, Manitoba insists that Reclamation has not adequately considered "how climate change-induced increases in the turbidity of raw intake water for the NAWS Project will impact the performance and effectiveness of the treatment system selected in the ROD." Manitoba Surreply [Dkt. 263] at 5. It takes issue with Reclamation's focus on climate change-induced increases of the flow and quantity of Missouri River water rather than its quality as impacted by turbidity. *See* Manitoba Mot. Sum. J. at 22.

Reclamation does not challenge Manitoba's overarching claim that turbidity can create issues for water treatment, *see* Transbasin Effects Report [Dkt. 260-3] 2015 AR 2015_103

at 180 ("High turbidity can reduce the efficacy of chlorination . . . and UV disinfection."), but disagrees with Manitoba's projection of the impact of turbidity on the Project given the use of Conventional Treatment and the water intake location at Lake Sakakawea. Commenting on the Draft SEIS, Manitoba emphasized the impact of turbidity if Reclamation retained the Chlorination/UV Inactivation treatment method. *See* Comments to Draft SEIS, 2015 AR 2015_104 at 227-31. In response to Reclamation's choice of Conventional Treatment in the 2015 SEIS, Manitoba expressly approved stating that "the 'preferred alternative' for water treatment identified in the Final [2015] SEIS represents the most sensible, and most protective, course of action." Comments to 2015 SEIS [Dkt. 260-2] 2015 AR 2015_100 at 40. Reclamation also clarified that water for NAWS will be withdrawn from Lake Sakakawea at the Snake Creek Pumping Plant, which "is located more than 100 miles from the reservoir headwaters" and therefore "likely not subject to significant inflow-related changes in turbidity." Transbasin Effects Report, 2015 AR 2015_103 at 181.

The argument thus arises from a scientific disagreement as to the nature and impact of climate change-induced turbidity in the relevant environment, not from a failure of Reclamation to consider and address the issue. For example, the parties disagree on the level of turbidity at which water treatment may be affected. *Compare* Transbasin Effects Report, 2015 AR 2015_103 at 180 ("For unfiltered water, the UV dose-response is generally not affected when the turbidity is less than 10 nephelometric turbidity units (NTU).") *with* Comments to Draft SEIS, 2015 AR 2015_104 at 228 ("A value of 5 NTU is . . . generally considered . . . to be the threshold beyond which chlorination's effectiveness can be reduced."). In addition, Manitoba challenges Reclamation's use of mean turbidity data, which it argues "mask[s] the impact of *maximum* turbidity values and intermittent spikes" and also underestimates the impact

of turbidity, *see* Manitoba Surreply at 6, while Reclamation argues that it "expressly analyzed the relationship between inflow in the [sic] Lake Sakakawea and turbidity []using data from an intake that was thirty miles *closer* to the Missouri River inlet []and which therefore would be expected to *overstate* any inflow impacts."  Recl. Reply [Dkt. 252] at 10-11 (emphasis added).

These dueling contentions do not answer the relevant question before the Court: has Reclamation adequately considered climate change and turbidity in preparing the 2015 SEIS?  The parties' disagreement over the interpretation of scientific studies or the application of those findings to the particulars of the NAWS Project does not lead to the conclusion that Reclamation failed to consider the relationship between climate change and turbidity or that its conclusions were arbitrary or capricious.  The Court is acutely aware of the legitimate fears behind Manitoba's position to "consistently oppose[] and continue[] to oppose inter-basin transfers of water."  Comments to 2015 SEIS, 2015 AR 2015_100 at 40.  However, the role of the Court under NEPA is not to evaluate the substantive decisions made in the 2015 SEIS but to ensure the agency has taken a "hard look" at environmental consequences and reasonable mitigation measures, and made an informed decision on whether and how to proceed.  *See Delaware Riverkeeper Network*, 753 F.3d at 1310 ("NEPA itself does not mandate particular results." (internal quotation marks omitted)).  NEPA is a procedural statute designed "to ensure 'a fully informed and well-considered decision, not necessarily' the best decision."  *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Circ. 2010) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)).  The Court finds that Reclamation has fulfilled its NEPA obligations here.

## B. Adaptive Management Plan

An EIS must include a "discussion of steps that can be taken to mitigate adverse environmental consequences." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989); *see also* 40 C.F.R. § 1508.25(b)(3) (requiring an EIS to include mitigation measures). Among other measures to mitigate potential future effects of AIS transfer due to NAWS, Reclamation plans to establish an Adaptive Management Plan to "flesh out Reclamation's . . . monitoring of the effectiveness of the water treatment systems at the Biota WTP" in Max, N.D. Recl. Reply at 14. Manitoba fears its exclusion from the Adaptive Management Plan and consequent inability to gauge any future risks to the Province during NAWS's operation. It argues that the 2015 SEIS fails to discuss mitigation sufficiently because: (1) the Adaptive Management Plan is not reasonably complete; and (2) Manitoba has not been included in the Adaptive Management Plan development process, which in turn indicates a failure "to ensure that effective future means of mitigating environmental consequences of an AIS/biota release will be fairly evaluated." Manitoba Mot. Sum. J. at 32-38.

Manitoba acknowledges "NEPA does not require that a complete mitigation plan be fully formulated and adopted, and that the agency need not present a mitigation plan that is 'legally enforceable, funded or even in final form to comply with NEPA's procedural requirements.'" *Id.* at 32 (quoting *Nat'l Parks & Conservation Ass'n v. Dep't of Transp.*, 222 F.3d 677, 681 n.4 (9th Cir. 2000)). However, it insists that Reclamation's discussion of the Adaptive Management Plan "fails to include sufficient detail to ensure fair evaluation of effective future measures to address the potentially catastrophic environmental consequences of an AIS/biota release." *Id.* at 34.

Such management plans come in a variety of sizes and details. In *Theodore Roosevelt Conservation Partnership*, the District of Columbia Circuit reviewed and found sufficient an adaptive management plan which included a "thirteen-page list of specific protective measures" that a review team would consider. 616 F.3d at 516. In contrast, the Ninth Circuit found insufficient under NEPA a two-paragraph "perfunctory description of mitigation measures." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

The Ninth Circuit recently approved an adaptive management plan that provided for "a regime of continued monitoring and inspection." *Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016). Similarly, Reclamation has outlined an Adaptive Management Plan that will provide a continuous monitoring process that will allow for flexible responses to unknown future environmental impacts. Its current lack of specificity reflects the current stage of Reclamation's planning process and not a failure "to ensure that environmental consequences have been fairly evaluated." *Robertson*, 490 U.S. at 352.

The Court appreciates Manitoba's desire to participate in the oversight of NAWS because it has legitimate concerns about AIS entering the Province as a result of NAWS and Reclamation has only reluctantly fulfilled its NEPA obligations. Neither party, however, cites any judicial authority to dictate membership in a future adaptive management group. Even if so, Manitoba's argument concerning non-inclusion is premature. "Reclamation has not yet formed the adaptive management team, given the pendency of this litigation" and so its membership remains speculative. Recl. Reply at 14. Manitoba insists that Reclamation's own guidelines compel it to include Manitoba, and/or other groups who commented unfavorably on Reclamation's environmental impact analyses, in the Adaptive Management Plan. *See* Manitoba

15

Mot. Sum. J. at 35-37 (relying on the Adaptive Management Technical Guide [Dkt. 252-2], which requires the participation of stakeholders and encourages the involvement of stakeholders with varying views).  It is unclear how these guidelines will be interpreted in this situation, when a management team is formed, given that Manitoba is the stakeholder with the most to lose if the mitigation measures fail to prevent AIS transfer into the Hudson Bay Basin.  Manitoba would also most benefit from the earliest possible notice of such intrusion into North Dakota's north side of the Basin Divide, to protect its waters and population.  Manitoba essentially asks the Court to assume that Reclamation will ignore the teachings of the *Safeguarding Report* and not include a representative of the Province on the management team without a court order to do so. The Court does not accept that assumption and, rather, gives Reclamation the benefit of presuming it will act reasonably and with full appreciation of the legitimacy of Manitoba's concerns when the time comes.

Sympathetic to Manitoba's long-standing interest in the NAWS Project, in March 2017, this Court directed Reclamation and North Dakota to advise the Court whether they "are willing to commit to adding a representative of the Province of Manitoba to the Adaptive Management Team to resolve amicably one issue now pending before the Court."  Minute Order dated April 3, 2017.  Reclamation responded that it "does currently intend to invite Manitoba to participate on a team to address the development of adaptive management goals and objectives for the water treatment systems within the Biota WTP."  Recl. Response [Dkt. 278] at 1 (record citations and internal quotation marks omitted).  North Dakota similarly "does not object to Reclamation inviting Manitoba to designate an appropriate technical representative to participate on the Adaptive Management Team."  North Dakota's Response [Dkt. 277] at 1.  Both include caveats, maintaining Reclamation's final decision-making authority and discretion to decide the

make-up of the team, and requiring Manitoba's representative to have technical expertise. *See* Recl. Response at 2; North Dakota Response at 2. The parties' responses underscore the crux of Manitoba's concern—participation in NAWS oversight going forward—and the fact that Manitoba has not yet been prevented from participation (indeed all parties seem to envision such continued participation).

### C. Risk of AIS Inter-Basin Transfer

Manitoba complains that Reclamation failed to assess adequately the risk that the Project will transfer AIS into the Hudson Bay Basin. It notes particularly Reclamation's continuing insistence that non-Project pathways for invasive species to reach the Hudson Bay Basin present a greater risk than the transfer of millions of gallons of Missouri River water each year over the course of future decades. *See* Manitoba Mot. Sum. J. at 9-10. It further faults Reclamation for failing to perform a quantitative analysis of the risk of AIS transfer. *See id.* at 15-19. Manitoba rightly points out significant limitations in Reclamation's analyses. Dr. Nicholas Friedenberg, the peer reviewer of the Transbasin Effects Report with most immediately relevant expertise,[4] recommended additional quantitative analysis, but Reclamation adopted a qualitative approach to assess the risk of AIS transfer. *Compare* Atkins Peer Review [Dkt. 260-11] 2015 AR 2015_111 at 10 ("Dr. Friedenberg . . . commented that the Report should have taken a quantitative rather than qualitative approach to risk analysis."), *with* 2015 SEIS, 2015 AR 2015_107 at 335 ("[B]ased on a qualitative assessment of the basin linkages and competing

---

[4] Reclamation retained Atkins, North America to conduct the peer review for the Transbasin Effects Report. Atkins selected three reviewers with expertise in: (1) fish pathogens and parasites; (2) ecological risk and consequence analysis; and (3) surface water treatment and disinfection for waterborne parasites and pathogens. *See* Atkins Peer Review [Dkt. 260-11] 2015 AR 2015_111 at 7. Dr. Friedenberg, a Senior Scientist in Applied Biomathematics in "ecological and evolutionary risk analysis," was selected as the expert in ecological risk and consequence analysis. *See id.* at 8, 31.

pathways, the risk of AIS transfer by the Missouri River alternatives is considered to be extremely low compared to non-Project pathways.").

In response, Reclamation first contends that its obligation was to evaluate the *consequences* of AIS transfer if caused by the Project, not the *risk* of AIS transfer. *See* Recl. Reply at 2. Reclamation insists that not a single case exists in which a court has held that an agency violated NEPA by inadequately assessing the risk of environmental harm. *See id.* at 3. Therefore, Reclamation contends, "the only relevance of an agency's risk assessment is that, when an agency determines that a potential impact has a low likelihood of occurring, *less* detailed analysis of the impact is required." *Id.*; *see Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 377 (D.C. Cir. 1981) ("Detailed analysis [of environmental consequences] is required only where impacts are likely. . . . Where adverse environmental impacts are not likely, expensive and time-consuming studies are not necessary.") (citation omitted)).

In stressing the distinction between consequence and risk, Reclamation misses the mark. As *Marsh* makes clear, consequence and risk are immutably tied: the greater the former, the greater the need to lessen or avoid the latter. A legitimate EIS must evaluate both risks *and* consequences before a reasonable choice can be made among options. Consequence must, perforce, include the *risk* of consequence.

There is no doubt, as Reclamation has catalogued, that numerous invasive species have had disastrous consequences when given the chance to propagate in a new environment. *See* 2015 SEIS, 2015 AR 2015_107 at 153-63; Transbasin Effects Report, 2015 AR 2015_103 at 195 ("Non-indigenous species can alter population, community, and ecosystem structure and function.") (citation omitted)); *see also Safeguarding Report* at 1 ("Invasive species pose one of the greatest ecological threats to the Nation's natural resources."). And there is no doubt that the

Missouri River Basin and the Hudson Bay Basin have been geologically separated for ages. *See Manitoba I*, 398 F. Supp. 2d at 47 ("NAWS would establish the first artificial link in 10,000 years between the Missouri River Basin and the Hudson River Basin."). Thus, the *consequences* should AIS propagate in the waters of the Hudson Bay Basin are not debatable; the disturbing question has always concerned the likelihood, *i.e.*, the *risk*, of such consequences and what design features to NAWS could reduce that risk and, thus, avoid potentially disastrous consequences.

These faulty arguments aside, the combination of the 2015 SEIS and ROD now require treatment and transmission methodologies that will significantly reduce the risks—and thereby the potential consequences—of AIS transfer between Basins. Critically responsive to Manitoba's argument, EPA convinced Reclamation that Conventional Treatment of Missouri River water in Max, N.D., is necessary before any piping across the Basin Divide, thereby inactivating and removing biota within the water before it crosses the Divide.[5] *See* Comments to Draft EIS, 2015 AR 2015_104 at 289; 2015 SEIS, 2015 AR 2015_107 at 89. Conventional Treatment of the water before transmission, in addition to the pipeline safeguards promised by Reclamation,[6] provide a significantly greater avoidance of the risk of AIS transfer. Both Manitoba and Canada, as *amicus*, agree on this point:

_____

[5] Manitoba argues further that NAWS will ultimately transfer "the equivalent of 13.6 acre feet of *untreated* Missouri River water" into the Hudson Bay Basin. Manitoba Mot. Sum. J. at 11. Reclamation protests that "[t]his contention is baseless: 100 percent of the Missouri River water will be treated prior to crossing the basin divide." Recl. Reply at 4-5; *see also* North Dakota Opp'n [Dkt. 251] at 14 ("All of the Project water from the Missouri River would be treated using Conventional Treatment . . . before it crosses the Hudson Bay Basin."). The Court finds that Manitoba's fears are based on erroneous interpretations of the data.

[6] The 2015 SEIS describes the following safeguards:

> These safeguards include isolation valves installed in strategic
> locations along the pipeline to minimize the volume of water

It is also Manitoba's long-standing position that, should the Project ultimately proceed, the Biota WTP must include a "multiple barrier" incorporating, as a minimum, conventional treatment. . . . The plant must also be located within the Missouri River Basin so that all biota removed by the plant and transferred to the plant waste streams remain within the Missouri River Basin.

*See* Comments to Draft SEIS, 2015 AR 2015_104 at 227; Canada Amicus Br. [Dkt. 178] at 6 (expressing concern with the transfer of unfiltered water across the Basin Divide).

The Court acknowledges, as Manitoba argues, that the 2015 SEIS and ROD offer no absolute certainty of protection against AIS being transported by Project pipelines into the Hudson Bay Basin. However, those documents identified the risks and consequences and committed to multiple mitigation measures to avoid them, including full Conventional Treatment before any water leaves the Missouri River Basin and an Adaptive Management Plan to monitor the water treatment process.[7] NEPA requires such analyses and such efforts to avoid the potential for clearly-disastrous consequences. Given Reclamation's careful analysis of the environmental impacts of NAWS, its decision to adopt Conventional Treatment, and its implementation of other mitigation measures, the Court finds that Reclamation adequately

---

released into the Hudson Bay basin in the event of a pipeline breach. Further, where the pipeline crosses a coulee or drainage, the joints are welded or constructed with restrained joint fittings and encased in concrete. . . . The pipeline was constructed to meet State Health Department guidelines for domestic water supply systems buried at a depth of 7 to 7.5 feet. . . . The State of North Dakota also conducted rigorous testing of the pipeline following installation.

2015 AR 2015_107 at 47 (citation omitted).

[7] In addition, Reclamation has committed to design measures to prevent or address any potential pipeline leaks. *See* 2015 SEIS, 2015 AR 2015_107 at 46. The 2015 SEIS discusses the construction of the various components of the Project and specific safeguards that have been incorporated into the construction to reduce the risk of AIS transfer. *See id.* at 47-48. It also highlights best management practices used during construction to avoid disturbance of aquatic organisms. *See id* at 320-23.

considered the risk of the transfer of AIS as a result of the Project. "In a NEPA challenge, '[t]he role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'" *Grunewald v. Jarvis*, 930 F. Supp. 2d 73, 78 (D.D.C. 2013) (quoting *Balt. Gas & Elec. Co.*. 462 U.S. at 97-98), *aff'd*, 776 F.3d 893 (D.C. Cir. 2015). The Court cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227-28 (1980) (internal quotation marks omitted); *Robertson*, 490 U.S. at 351 ("NEPA merely prohibits uninformed—rather than unwise—agency action.").

Reclamation's decision now rests on its determinations concerning serious and conflicting policy issues and goals, which are not the purview of the Court.

### D. Predetermination Without Analysis of In-Basin Alternatives

Manitoba's concern from the outset has been that Reclamation would not impartially consider in-basin water sources fully but, instead, jump immediately to its preferred choice of Lake Sakakawea water despite its origin outside the Hudson Bay Basin. *See* Manitoba Mot. Sum. J. at 41 (arguing that Reclamation "long ago decided that the primary source for the NAWS project would be Missouri River water transferred across the [Basin Divide]"). Manitoba points to the fact that $31 million worth of infrastructure required for Reclamation's preferred alternative had been construed prior to the 2015 SEIS, *see id.*, and insists that Reclamation has strategically conducted quantitative analyses only when it "would serve its pre-ordained Missouri River preference." *Id*. at 45. There is some validity to this concern: Reclamation has come very late to a full EIS for the Project. However, now that it has done so and explained its

rejection of in-basin water alternatives, Manitoba's objections on this basis are insufficient to cause the Court to reject the 2015 SEIS.

Chapters Three ("Affected Environment") and Four ("Environmental Impacts") of the 2015 SEIS describe the resources that could be affected and the anticipated environmental impacts caused by the development and operation of NAWS.  *See* 2015 SEIS, 2015 AR 2015_107 at 101-430.  Following a lengthy discussion of in-basin sources of water (on the northern side of the Basin Divide), the 2015 SEIS concluded that the alternatives of Groundwater with Recharge and/or Groundwater with Recharge and Souris River would increase the number of days in which the flows in the Souris River would be reduced to near-zero flow which could lead to higher water temperatures.  *See id.* at 273-89.  Changes in flow levels and water temperatures can potentially affect water quality "due to a reduced capacity to dilute incoming pollutants and higher productivity with higher temperatures."  *Id*. at 288, 297.  There is also a risk of impairment to the beneficial uses of fish and aquatic biota.  *See id*.  These projections were found to make both alternatives unacceptable.  In selecting Lake Sakakawea as the water source, the 2015 SEIS explained that the Missouri River System, consisting of six dams and reservoirs operated by the Army Corps of Engineers, "has the capacity to store 72.3 million [acre feet] (MAF) of water . . . [making] it the largest reservoir system in North America."  *Id*. at 133 (citation omitted).  Fully one-third of that storage (23.6 MAF) exists in Lake Sakakawea.  *See id*. at 136.  At oral argument, North Dakota emphasized the small percentage of water that would be diverted from the Missouri River Basin for NAWS.

Manitoba expresses great concern with perceived dual problems:  (i) Reclamation's failure to build a regional groundwater model to assess the sustainable yield of the Minot and Sundre aquifers, and therefore the possibility that the Project could be sustained

through an in-basin alternative, combined with (ii) its willingness to rely on quantitative models to support its conclusion that Lake Sakakawea would be a sustainable water source. *See* Manitoba Mot. Sum. J. at 44-45. In response, Reclamation points out that the Missouri River system has been extensively modeled by the Army Corps of Engineers, which allowed for a complete quantitative analysis. *See* Recl. Reply at 20. Reclamation also argues that it conducted a thorough qualitative analysis of the Minot and Sundre aquifers' sustainable yields and groundwater for recharge of the aquifers, and also analyzed thoroughly the water supply potential from combining the aquifers and available water from the Souris River. *See id.* at 18. Beyond insisting that a quantitative model of the in-basin water sources would have been best to assess the sustainability of an in-basin alternative, Manitoba fails to explain why Reclamation's current analysis is otherwise lacking. NEPA demands that agencies engage in informed decision-making. *See WildEarth Guardians*, 738 F.3d at 303. Reclamation has explained the logistical and timing difficulties with a quantitative analysis of in-basin water resources with enough detail to support its decision-making here.

Manitoba offers reverse osmosis as an alternative treatment option for in-basin water sources, which it argues Reclamation failed to consider carefully and rejected cursorily due to high costs but without support for that conclusion. *See* Manitoba Mot. Sum. J. at 47. Manitoba raised this concern earlier in this litigation and the Court already determined that Reclamation adequately considered reverse osmosis as an alternative and had good reasons to reject that option: "Each community's reverse osmosis plant would require a building large enough to house the required number of reverse osmosis treatment units[;] . . . the reverse osmosis process requires high energy use and includes the generation of a brine which requires disposal[;] . . . [and] the capital costs . . . were more expensive than the capital costs for the

preferred alternative." *Manitoba II*, 691 F. Supp. 2d at 46 (record citations omitted). Manitoba

points to no new information in the 2015 EIS or the Administrative Record to change the Court's

decision.

Manitoba correctly argues that in order to achieve the aims of NEPA, an EIS

"shall serve as the means of assessing the environmental impact of proposed agency actions,

rather than justifying decisions already made." 40 C.F.R. § 1502.2(g). However, "[t]he standard

for proving predetermination is high" and should not be reached lightly. *Stand Up for*

*California!*, 204 F. Supp. 3d at 303 (citing *Forest Guardians v. Fish and Wildlife Service*, 611

F.3d 692, 714 (10th Cir. 2010)). As the Tenth Circuit has explained, "predetermination occurs

only when an agency *irreversibly and irretrievably* commits itself to a plan of action that is

dependent upon the NEPA environmental analysis producing a certain outcome, *before* the

agency has completed that environmental analysis." *Forest Guardians*, 611 F.3d at 714; *accord*

*Stand Up for California!*, 204 F. Supp. 3d at 304.

It bears noting that "agency officials . . . need not be subjectively impartial."

*Carolina Envtl. Study Grp. v. United States*, 510 F.2d 796, 801 (D.C. Cir. 1975). "[A]gencies

are generally driven by policy objectives and frequently prefer one course of action over another

from the beginning of a project," and, therefore, "[b]ias towards a preferred outcome does not

violate NEPA so long as it does not prevent full and frank consideration of environmental

concerns." *Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 205-06 (D.D.C. 2015).

Thus, in determining what is an "irreversible and irretrievable" commitment, the

District of Columbia Circuit has looked "to the practical effects of [an] agency's conduct rather

than whether the conduct suggests subjective agency bias in favor of the project." *Id*. at 207. In

*Sierra Club v. Peterson*, the Circuit held that the agency must prepare an EIS "*prior* to a

decision, when the decisionmaker retains a maximum range of options." 717 F.2d 1409, 1414 (D.C. Cir. 1983). The Circuit concluded that, by entering a lease without "retain[ing] the authority to preclude" activities until an EIS was complete, the agency had violated NEPA. *Id.* at 1415. In *Wyoming Outdoor Council v. Forest Service*, the Circuit rejected a challenge to NEPA compliance by the United States Forest Service after the Service had consented to lease a specific parcel of land but before the lease had been finalized. 165 F.3d 43, 46 (D.C. Cir. 1999). The Circuit concluded that the Service had not reached "the point of irreversible and irretrievable commitment of resources" because at the time the lawsuit was filed, no lease had actually been issued. *Id.* at 50.

In one sense, this legal principle is purely commonsensical: no federal agency can forecast the scope of an action, and the concomitant need for an EIS, until planning is in a fairly advanced stage. As long as that planning does not obscure or prevent full consideration and evaluation of environmental impacts, which point underlies the Court's 2005 Injunction, an agency's preference cannot be attacked on subjective grounds.

The Court agrees that Reclamation has been particularly focused on using water from Lake Sakakawea, with early congressional direction and cheerleading. Congressional authorization for NAWS was adopted in 1965, before NEPA was enacted on January 1, 1970. *See* Act of Aug. 5, 1965, Pub. L. No. 89-108, 79 Stat. 433 (authorizing Reclamation to construct a project diverting Missouri River water from Lake Sakakawea for irrigation, municipal and industrial, and other uses in North Dakota); National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*; *see also* Garrison Diversion Unit Reformulation Act of 1986, Pub. L. No. 99-294, 100 Stat. 418 (authorizing Reclamation to plan and construct a project providing water to North Dakota). More recently, Congress amended the law authorizing NAWS, specifying that it does

not supersede NEPA and that "[n]o design or construction of any feature or features that facilitate an out-of-basin transfer from the Missouri River drainage basin shall be authorized under the provisions of this subsection." Dakota Water Resources Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763, § 608(b)(4); *see also id*. § 608(c)(1) ("Nothing in this section shall be construed to supersede any requirements under the National Environmental Policy Act or the Administrative Procedure Act.").

Thus, these various directives from Congress do not change the purpose of the Project—water for communities in northwest North Dakota—or NEPA's requirements that a federal agency study the environmental impacts of any planned project; evaluate the options, their potential impacts, and mitigation measures; and then make a reasoned selection among the options. Reclamation cites the 1965 authorization to explain its focus but the 1965 authorization has no bearing on whether Reclamation has, today, fulfilled its NEPA obligations.

Manitoba's concerns do not rise to the level of predetermination. The Court has already considered, on multiple occasions, the potential environmental impact of construction on the NAWS project prior to the completion of a final EIS and has issued, and subsequently modified, a tailored injunction to accommodate competing interests. North Dakota and Reclamation have complied with the Court's orders. *See* Injunction [Dkt. 95] at 5 (accommodating competing interests "by permitting work to proceed to the extent it does not affect the environment or the NEPA process"); *see also* March 24, 2006 Minute Order (granting Defendants' motion to modify the injunction); March 18, 2010 Minute Order (granting North Dakota's unopposed motion to modify the injunction); October 25, 2010 Order [Dkt. 193] (granting in part and denying in part North Dakota's motion to modify the injunction); March 1, 2013 Order [Dkt. 208] (modifying order to allow North Dakota to finish the Minot treatment

plant upgrade but not permitting any further pipeline construction or contracts); February 7, 2017 Order [Dkt. 273] (granting consent motion to modify injunction to allow upgrades for flood protection); April 11, 2017 Order [Dkt. 276] (granting North Dakota's motion to modify following remand). NAWS construction has been closely monitored by this Court to avoid the very concerns inherent to predetermination.

More importantly, the fact that Reclamation started with a preference for the outcome does not require rejection of its 2015 SEIS and ROD, as long as those documents demonstrate the full consideration of environmental consequences and avoidance of those consequences, as mandated by the law. *See Foxx*, 87 F. Supp. 3d at 205-06. Because the Court finds that the 2015 SEIS and ROD together pass muster under NEPA, it does not find Manitoba's complaints concerning predetermination as a basis to reject them.

### E. The State of Missouri's Claims

The State of Missouri joined this lawsuit as a plaintiff in February 2009 and challenges the 2015 SEIS and ROD for alleged failures to consider thoroughly the effects of annually withdrawing billions of gallons of water from Lake Sakakawea on the downstream residents of the Missouri River. Missouri proudly states that it sues as *parens patriae* on behalf of its residents. *See* Missouri's Mot. Sum. J. at 44. Reclamation opposes Missouri's attacks on its studies and conclusions and also contends that Missouri has not shown that it has standing to sue. *See* Recl. Mot. Sum. J. at 44-45. Before it can consider the merits of Missouri's challenges, the Court must first establish with certainty that it has jurisdiction over the State's claims. Missouri bears the burden of establishing its standing. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (stating that courts have an obligation to assure themselves of litigants standing under Article III). Ultimately, "[i]f a dispute is not a proper case or controversy [under

Article III of the United States Constitution], the courts have no business deciding it, or expounding the law in the course of doing so." *Id*. Absent standing, the Court's exercise of judicial power "would be gratuitous and thus inconsistent with the Art. III limitation." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976).

In this instance, the dispute concerns whether Missouri, in its role as *parens patriae* of its residents, can sue the Federal Government.

### 1. *Parens Patriae*

*Parens patriae* is a Latin term with the literal meaning "parent of the country." *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600 (1982). It represents a legal doctrine arising in English common law that recognized the inherent sovereign power and authority of the King to protect persons who were legally unable to act on their own behalf. *See id*. The concept has been carried over to the United States and evolved away from the traditional concept of a state "stepping in to represent the interests of particular citizens who, for whatever reason, cannot represent themselves." *Id*. Quite the contrary, the American concept of *parens patriae* requires a state to assert a quasi-sovereign interest, apart from the interests of particular private parties. *Id*. at 607.

*Missouri v. Illinois* provides an early discussion of a state's right to represent its residents. 180 U.S. 208 (1901). Missouri sought a remedy from Illinois in the form of "relief against the pouring of sewage and filth through [a drainage canal], by artificial arrangements, into the Mississippi river, to the detriment of the state of Missouri and her inhabitants." *Id*. at 248. Under those circumstances, the Supreme Court explained:

> [I]t must surely be conceded that, if the health and comfort of the inhabitants of a state are threatened, the state is the proper party to represent and defend them. If Missouri were an independent and sovereign state all must admit that she could seek a remedy by

28

> negotiation, and, that failing, by force. Diplomatic powers and the
> right to make war having been surrendered to the general
> government, it was to be expected that upon the latter would be
> devolved the duty of providing a remedy, and that remedy, we think,
> is found in the constitutional provisions we are considering.

*Id.* at 241. The referenced "constitutional provisions" are found in the Constitution's Article III,

section 2, which states: "The judicial power shall extend to all Cases, in Law and Equity, arising

under this Constitution, the Laws of the United States, and Treaties made, or which shall be

made, under their Authority; . . . to Controversies between two or more states." U.S. Const. art.

III, § 2. Relying on Article III, the Court held that Missouri had standing to sue for an injury to

the "health and comfort of the inhabitants" of the state. *Missouri*, 180 U.S. at 241.

*Massachusetts v. Mellon* discussed *parens patriae* and a state's role in

representing its residents in the context of a challenge to the Maternity Act, 42 Stat. 224, c. 135

(1921). 262 U.S. 447, 479 (1923). The purpose of the Maternity Act, and a federal bureau

established to receive reports on state use of federal grants, was to reduce maternal and infant

mortality. *See id*. Under the law, future federal grants would be withheld from states which had

"not . . . properly expended" grant monies, as determined by the bureau. *Id*. Massachusetts

challenged the unequal apportionment of the grants among the states, *i.e.* between those that

agreed to comply and those, like Massachusetts, that did not. *Id*. The Supreme Court found that

Massachusetts could not continue its suit because the case "called upon [the Supreme Court] to

adjudicate, not rights of person or property, not rights of dominion over physical domain, not

quasi sovereign rights actually invaded or threatened, but abstract questions of political power, of

sovereignty, of government." *Id*. at 484-85. As pertinent to this lawsuit, the Court continued:

> [T]he citizens of Massachusetts are also citizens of the United
> States. It cannot be conceded that a state, as parens patriae, may
> institute judicial proceedings to protect citizens of the United States
> from the operation of the statutes thereof. While the state, under

some circumstances, may sue in that capacity for the protection of its citizens . . . , it is no part of its duty or power to enforce their rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as parens patriae, when such representation becomes appropriate; and to the former, and not to the latter, they must look for such protective measures as flow from that status.

*Id.* at 485-86 (citation omitted).

Leaping forward to 1982, *Alfred L. Snapp & Son, Inc.* "involve[d] the 1978 apple harvest on the east coast . . . [which was] apparently a good year for apples, resulting in a substantial need for temporary farm laborers to pick the crop." 458 U.S. at 597. The lawsuit was brought by the Commonwealth of Puerto Rico for injunctive relief requiring East Coast apple growers to comply with federal law and for a declaration that the growers had preferred foreign over domestic laborers, to the detriment of the workers and economy of Puerto Rico and in violation of federal law. *See id*. at 598. The question before the Court was whether Puerto Rico could sue in its role as *parens patriae* of its resident apple-pickers, although relatively small in number compared to its entire population. *See id*. at 599.

*Snapp* included a lengthy exegesis on the doctrine of *parens patriae* and how it is distinguishable from other state's rights. First, the Court "easily identified" true sovereign interests of each state: the sovereign power of a state to create and enforce its laws, and the sovereign power of a state to demand recognition from other sovereigns, which "most frequently . . . involves the maintenance and recognition of borders." *Id*. at 601. Second, the Court identified two "nonsovereign interests:" a state's proprietary interests, such as its ownership in land or a business venture, and the interests of a private party resident in the state, in which case the state is "no more than a nominal party." *Id*. at 601-02. Finally, the Court elaborated on a third category of distinguishable interests, which it called "quasi-sovereign interests."

> Quasi-sovereign interests stand apart from all three of the above: They are not sovereign interests, proprietary interests, or private interests pursued by the State as a nominal party. They consist of a set of interests that the State has in the well-being of its populace. Formulated so broadly, the concept risks being too vague to survive the standing requirements of Art. III: A quasi-sovereign interest must be sufficiently concrete to create an actual controversy between the State and the defendant.

*Id.* at 602. In granting standing to Puerto Rico, the Court distinguished that case from *Massachusetts v. Mellon* on the basis that Puerto Rico brought suit "against private defendants." *Id*. at 610, n.16. Relying on *Massachusetts v. Mellon* it further opined that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Id*.

Without referencing these earlier decisions, Missouri relies on *Massachusetts v. EPA*, 549 U.S. 497 (2007), to support its standing here. *See* Missouri Mot. Sum. J. at 44-47. In that case, the Commonwealth of Massachusetts sued the federal Environmental Protection Agency to require it to engage in rulemaking to regulate greenhouse gas emissions from automobiles. *See Massachusetts v. EPA*, 549 U.S. at 504. Massachusetts contended that global warming was inexorably raising sea levels and injuring the Commonwealth's coastlines. *See id*. at 522. The federal government challenged the Commonwealth's standing. *See id*. at 517.

In a decision authored by Justice Stevens, the Supreme Court was persuaded that global warming is a legitimate scientific prediction and that damage to the Massachusetts coastline could be foreseen. *Id*. at 521. It therefore found that Massachusetts had satisfied the requirements for standing as defined in *Lujan v. Defenders of Wildlife*, which required that "the party bringing suit must show that the action injures him in a concrete and personal way." 504 U.S. 555, 581 (1992); *see Massachusetts v. EPA*, 549 U.S. at 521.

Specifically, the Supreme Court found that Massachusetts had standing because it had a "special position and interest," namely, it "is a sovereign State" rather than a private

individual and it "does in fact own a great deal of the territory alleged to be affected."

*Massachusetts v. EPA*, 549 U.S. at 518-19 (internal quotation marks omitted). It also suggested

that Massachusetts had a procedural right under the statute:

> Congress has ordered EPA to protect Massachusetts (among others)
> by prescribing standards . . . . Congress has moreover recognized a
> concomitant procedural right to challenge the rejection of its
> rulemaking petition as arbitrary and capricious . . . . Given that
> procedural right and Massachusetts' stake in protecting its quasi-
> sovereign interests, the Commonwealth is entitled to special
> solicitude in our standing analysis.

*Id.* at 519-20 (citations omitted).[8] However, while the majority referred to "quasi-sovereign

interests," it never once mentioned a role for Massachusetts as *parens patriae* and never

distinguished or overruled *Snapp* and its limitations on the doctrine. Rather, the Court appears to

have relied on two other bases to give Massachusetts standing: a nonsovereign proprietary

interest, *id*. at 519 (finding that "Massachusetts does in fact own a great deal of the" affected

land); and a statutory conferral of standing, *id*. at 520 ("Congress has . . . recognized a

concomitant procedural right."). In dissent, Chief Justice Roberts said that there was confusion

in the majority's standing analysis: "The Court asserts that Massachusetts is entitled to 'special

solicitude' due to its 'quasi-sovereign interests' . . . '*in its capacity as a landowner.*' . . . In the

context of *parens patriae* standing, however, we have characterized state ownership of land as a

'nonsovereign interest.'" *Id*. at 539 (Roberts, CJ, dissenting) (quoting *Snapp*, 458 U.S. at 601).

The Chief Justice added: "On top of everything else, the Court overlooks the fact that our cases

cast significant doubt on a State's standing to assert a quasi-sovereign interest—as opposed to a

---

[8] This "procedural right" was directly challenged by the Chief Justice in dissent: "The reader
might think from this unfortunate phrasing that Congress said something about the rights of
States in this particular provision of the statute. Congress knows how to do that when it wants to
. . . but has done nothing of the sort here." *Snapp*, 549 U.S. at 537 (Roberts, CJ, dissenting)
(citations omitted).

direct injury—against the Federal Government." *Id.* Reading the opinion as a whole, and assuming any omissions to be intentional, the majority's reference to quasi-sovereign interests without further elaboration on the doctrine of *parens patriae* does not suggest, in this Court's view, that Justice Stevens intended to rely on *parens patriae* to grant Massachusetts standing or to overturn years of case law on the doctrine.

Relevant cases decided by the D.C. Circuit must also be considered. The Circuit has already ruled that a state cannot proceed as *parens patriae* when the United States, the superior "parent of the country," is the defendant. *Commonwealth of Pennsylvania v. Kleppe* illustrates the point. 533 F.2d 668 (D.C. Cir. 1976). In that case, Pennsylvania sued the Administrator of the Small Business Administration (SBA) over its classification of geographic areas entitled to SBA relief from a devastating hurricane, which had the result of omitting hard-hit areas in the Commonwealth. *See id.* at 670. The D.C. Circuit recognized that "in some instances a state may . . . sue to vindicate the interests of its citizens." *Id.* at 671. However, it decided that the extent to which a state may sue as a representative of its residents "must be qualified by [a] statement of the type and extent of the interests to be represented, and *of the defendants against whom the action is brought*." *Id.* at 673 (emphasis added).

Thus, "when a state seeks to sue either another state, or some branch of the federal government, significant policy concerns, apart from the injury itself, become relevant in determining the state's fitness to bring suit." *Id.* at 675-76. Explaining its meaning, the District of Columbia Circuit added that "these concerns involve the proper allocation of authorities within the federal system." *Id.* at 676. The constitutional underpinning of the relationship between the states and the Federal Government propels these concerns and thus "important arguments for denying state standing do exist." *Id.* Because the Constitution established a

strong central government (intended to have constitutional powers broader and with greater authority than its predecessor under the Articles of Confederation), and *also* recognized that "powers not delegated to the United States . . . are reserved to the States," U.S. Const. amend. X, both the federal government and the states "act as *parens patriae* within their separate spheres of activity." *Kleppe*, 533 F.2d at 677. Thus, when it comes to a question of federal law, the issue devolves to which entity is the appropriate *parens patriae*.

As expressed in *Kleppe*, "the state can not [sic] have a quasi-sovereign interest [when] the matter falls within the sovereignty of the Federal Government." *Id.* Discussing *Massachusetts v. Mellon*, the District of Columbia Circuit opined "[w]hile it is debatable whether the Court in that case meant to bar all state parens patriae suits against the Federal Government, the opinion makes clear at least that the federal interest will generally predominate and bar any such action." *Id.* Quoting *Massachusetts v. Mellon*, the Court further inferred that by stating, "'it is no part of [a state's] duty or power to enforce [the rights of its citizens] in respect of their relations with the federal government,'" the Supreme Court seemed to espouse "a flat denial of state parens patriae power in areas where federal power exists, and thus would bar any such suit against the Federal Government." *Id.* at 677 n.52 (quoting *Massachusetts v. Mellon*, 262 U.S. at 485-86). Despite inclining "to the view that no asserted state interest in economy or welfare would support standing to challenge a program running directly between the Federal Government and the citizens," the District of Columbia Circuit declined to make such a holding and limited its ruling to the facts before it. *Id.* at 679. In regard to Pennsylvania's claims that the SBA's allocation of disaster relief funds was injurious to its citizens, because Pennsylvania's complaint would take the Court "very far into the internal workings of a federal agency" and "it is difficult to see how a state could more substantially intrude itself" into federal operations, the

Circuit concluded that Pennsylvania had no standing as *parens patriae* to sue the federal agency. *Id.* at 680.

> *Maryland People's Counsel v. Federal Energy Regulatory Comm'n*, 760 F.2d 318 (D.C. Cir. 1985) (Scalia, J.), enlarged upon this analysis. In that case, the plaintiff challenged a "natural gas special marketing program established by the Federal Energy Regulatory Commission." *Id.* at 319. Then-Judge Scalia analyzed whether the plaintiff had standing, relying on precedent to guide the outcome:

> A state's interest in those aspects of the welfare of its citizens secured and furthered by government—that is, a state's so-called "quasi-sovereign" interest—is unquestionably sufficient to confer standing upon the state as *parens patriae*. *See, e.g., Alfred L. Snapp & Son, Inc., v. Puerto Rico*, 458 U.S. 592 (1982); *Missouri v. Illinois*, 180 U.S. 208 (1901). However, "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government," *Alfred L. Snapp & Son*, 458 U.S. at 610, n.16 (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923)).

*Id.* at 320. *Maryland People's Counsel* also cited *Kleppe*'s denial of standing to Pennsylvania to sue a federal agency. *Id.* Ultimately, however, despite these considerations, the Circuit held that the Maryland People's Counsel had standing to sue because it was expressly granted standing by statute. *Id.* at 250-51 (finding that the statutory provision was "designed to recognize precisely the interest of the states in protecting their citizens . . . that is, the states' *parens patriae* interest").

## 2. Missouri's Standing Here

Missouri is very clear that it sues in its role as *parens patriae* on behalf of its residents. *See* Missouri Mot. Sum. J. at 44 ("Missouri has standing to bring this lawsuit in its capacity as *parens patriae*."). However, as the prior discussion makes clear, the identity of the defendant sued by a state as *parens patriae* is a matter of consequence. Unless *Massachusetts v.*

*EPA* dramatically changed legal doctrine, a state cannot sue the United States in the state's role as *parens patriae* because the United States is the superior "parent of the country."  Missouri's reliance on *State of Georgia v. Pennsylvania R. Co.* is of no consequences as that case "involved no question of distribution of powers between the State and the national government."  324 U.S. 439, 445 (1945).

In this Court's study of the decision, *Massachusetts v. EPA* did not change these longstanding limitations on a state's standing to sue the federal government as *parens patriae*. The majority opinion, which indicated solicitude to the Commonwealth, did not discuss *parens patriae* or the doctrine's underpinnings and limitations.  Contrary to relying on *parens patriae*, the Supreme Court twice noted that Massachusetts owns a substantial portion of its coastal property, which was sufficient to have "alleged a particularized injury in its capacity as a landowner."  *Id.* at 522, *see also id*. at 519 (stating that Massachusetts owns a great deal of the affected territory).

This Court recognizes that a state has standing to sue the federal government in multiple circumstances.  The question here, however, is limited to whether Missouri can sue the federal government as *parens patriae* of its residents.  The Court concludes that the majority opinion in *Massachusetts v. EPA* did not speak to the doctrine of *parens patriae*, without regard to whatever status the Commonwealth had claimed below.  Instead, the opinion carefully avoided that doctrine, which might have required overruling decades of precedent.

There is no doubt that the Supreme Court is the last word.  *See Marbury v. Madison*, 5 U.S. 137 (1803).  As to this suit, this Court finds that precedent of the Supreme Court and the District of Columbia Circuit instruct that Missouri cannot sue the Federal Government in the State's role as *parens partriae*.  *See Snapp*, 458 U.S. at 610, n.16 ("A State does not have

standing as *parens patriae* to bring an action against the Federal Government."); *Massachusetts v. Mellon*, 262 U.S. at 485-86 (holding "it is no part of [the states'] duty or power to enforce their rights in respect of their relations with the federal government"); *Maryland People's Counsel*, 760 F.2d at 320 (holding that a state does not have standing as *parens patriae* to bring an action against the federal government); *Kleppe*, 533 F.2d at 677 (holding the state cannot "have a quasi-sovereign interest because the matter falls within the sovereignty of the Federal Government"). Ultimately, *Massachusetts v. EPA* did not disturb those precedents.

Because the State of Missouri advances no other basis for its standing, the Court must conclude that it has no standing in this suit and that the Court has no jurisdiction to adjudicate its claims. The Complaint filed by the State of Missouri, Dkt. 271, will be dismissed.

## IV. CONCLUSION

After several attempts, Reclamation has produced an EIS that fulfills the requirements of NEPA. Reclamation and North Dakota's Motions for Summary Judgment, Dkts. 242 and 243, will be granted, and Manitoba's Cross-Motion for Summary Judgment, Dkt. 247, will be denied. Missouri's Complaint, Dkt. 271, will be dismissed for lack of standing and its Cross-Motion for Summary Judgment, Dkt. 246, will be denied as moot. Accordingly, the Court's Injunction, Dkt. 95, shall be lifted. A memorializing Order accompanies this Opinion.

Date: August 10, 2017

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge